## OVERNITE TRANSPORTATION COMPANY *vs.* COMMISSIONER OF REVENUE.

No. 99-P-1849.

Suffolk. November 15, 2001. - March 12, 2002.

Present: BECK, KAPLAN, & DUFFLY, JJ.

*Taxation,* Corporate excise. *Negotiable Instruments,* Note. *Debt. Interest.*

The Appellate Tax Board correctly concluded that a corporation (taxpayer) did not sustain its burden of proving, for purposes of the corporate excise tax, that a promissory note it declared as a dividend in favor of its parent corporation constituted indebtedness and, therefore, the taxpayer's claimed "interest" expenses could not be treated as deductions from gross income in respect to the net income measure of its tax, and the note could not figure as a liability in calculating the net worth measure. [186-192]

APPEAL from a decision of the Appellate Tax Board.

*Robert M. Buchanan, Jr.* (*Kathleen King Parker* with him) for the taxpayer.

*Peter T. Wechsler,* Assistant Attorney General, for Commissioner of Revenue.

KAPLAN, J. We conclude, in agreement with the Appellate Tax Board, that the appellant corporation, the taxpayer, did not sustain its burden of proving, for purposes of the corporate excise tax, that a promissory note it declared as a dividend in favor of its parent corporation was true indebtedness. The Appellate Tax Board held correctly that the appellant's claimed "interest" expenses could not be treated as deductions from gross income in respect to the net income measure of the appellant's tax, nor could the note figure as a liability in calculating the net worth measure.

*Narrative.* 1. In 1985, appellant Overnite Transportation Company (Overnite), a Virginia corporation, was the largest LTL trucking company — hauling less than full truckloads —

in the country. The company had had robust revenue growth over the previous ten years, with average increases of about 17% per year. At the end of the period it was debt free except for a relatively insignificant amount. Union Pacific Corporation (Union Pacific), owner of railroads as well as a variety of other businesses, became interested in Overnite because of the advantages possibly achievable from the movement of freight by trucks and rail in cooperative or synergistic fashion.

In October 1986, Union Pacific, with money it borrowed for the purpose largely from banks, made a successful tender offer to Overnite's shareholders of $43.25 per share, a total cost of $1.2 billion. The stock had been selling in the market in 1985 at a low of $12\frac{7}{8}$ to a high of $21\frac{7}{8}$. The value of Overnite's assets as shown on its 1985 balance sheet was around $300 million (the figure $343 million appears in the 1986 annual report of Union Pacific). Thus Union Pacific was paying a premium of 200% to 400% of the share trading value, and about $900 million over the value of Overnite's assets.

The purchase became effective as of November 1, 1986, subject to approval by the Interstate Commerce Commission. This was given in October, 1987. Overnite then adjusted its books, increasing the amount listed on its balance sheet for "intangible assets" from $491,061 to $904,515,009, which, with other adjustments, caused its net worth[1] to appear on its 1987 balance sheet as rising from about $300 million to $1.2 billion. The leap reflected Union Pacific's cost of acquiring the shares but, as indicated by Harold Diggs, Overnite's executive director of taxes, the outlay was extraneous and did not as a matter of substance increase Overnite's assets or net worth.

On December 12, 1988, Union Pacific organized Overnite Holding, Inc. (Holding), a Delaware corporation, retained the Holding shares, and made a "capital contribution" to Holding of the shares of Overnite. So Overnite emerged a wholly owned subsidiary of Holding, and Holding a wholly owned subsidiary of Union Pacific.

On December 29, 1988, Overnite voted a dividend in favor of Holding in the amount of $600 million, payable in the form

---

[1]As used in this discussion, "net worth" means the book value of Overnite's total assets less its liabilities. See G. L. c. 63, § 30(9).

of a note,[2] and, the next day, issued the note, the short text of which appears in the margin.[3] The note promised payment of $600 million in 1998, ten years after issuance, and began to accrue quarterly interest commencing on March 31, 1989, at rates equal to the rates charged by Union Pacific from time to time for its intercompany advances. The words of the note were regular in form but, by reason of omissions, the note was unusual in substance. The note did not recite any consideration for the promises, nor did Overnite receive any. The note was not secured by any Overnite assets, and there was no provision for a sinking fund or reserve, for any required partial payments or redemption of the principal, or for measures to enforce payments or to deal with defaults.

In 1987, as requested by Union Pacific, Overnite had prepared a forecast of the net income it might earn in the years 1988 through 1993. By the calculations of Dr. Ralph Kimball, Overnite's expert witness, Overnite would have been able to support the interest and retire the principal at maturity if the 1988-1993 forecast had proved accurate and the company's net income grew after 1993 at an assumed average rate of 10%. Unhappily, Overnite realized neither its own forecast nor Kimball's growth assumptions, both summarized below. In fact the only year in which the company met (actually exceeded) the estimate was 1988.

| Year | Net Income Forecast (in millions) | Net Income Earned (in millions) |
|------|------|------|
| 1988 | $50.3 | $58 |
| 1989 | $60.2 | $48 |
| 1990 | $71.4 | $56 |

[2]Overnite's resolution was as follows: "RESOLVED, that a dividend of $600 million to [Holding] be and hereby is declared, payable on December 30, 1988 in the form of a Promissory Note . . . the principal amount of which is due in ten years, with interest payable quarterly in arrears at the rate charged by [Union Pacific] for intercompany advances. . . ."

[3]Overnite "hereby promises to pay to [Holding] . . . the principal sum of $600 million no later than ten (10) years from the date hereof with interest payable thereon quarterly in arrears on March 31, June 30, September 30 and December 31 of each year . . . . The interest rate shall be equal to the rate charged by [Union Pacific] for intercompany advances."

Overnite Transportation Company v. Commissioner of Revenue.

| | | |
|---|---|---|
| 1991 | $83.0 | $33 |
| 1992 | $98.0 | $60 |
| 1993 | $117.3 | -$15 |
| 1994 | $129.0 | $64 |
| 1995 | $141.9 | -$10 |
| 1996 | $156.1 | -$23 |
| 1997 | $171.7 | $24 |
| 1998 | $188.9 | N/A[4] |
| Total | $1,267.8 | $295 |

Commencing on March 31, 1989, Overnite began transferring funds to Holding (which passed them to Union Pacific in the form of dividends). Although the note purportedly established quarterly payment dates of March 31, June 30, September 30, and December 31 of each year, Overnite did not adhere to this schedule. There were four months in which a transfer was due but not made. There were twenty-three months in which no transfer was due but a transfer was made. There was one month in which Holding transferred funds to Overnite. For no quarter did Overnite pay the amount of interest purportedly due in that quarter, most times transferring significantly less, occasionally more. From the beginning, Overnite was in arrears on its interest payments. As shown in the table below, from March 1989 through December 1993, the shortfall was $48 million (17% of total accrued interest); from March 1994 through December 1997, it was $48 million (24% of total); and overall from March 1989 through December 1997, it was $96 million (20% of total).

| Year | Interest Rate | Interest Accrued (by year) | Amount Transferred (by year) | Amount in Arrears (cumulative) |
|---|---|---|---|---|
| 1989 | 10% | $60,328,767 | $38,644,281 | $21,684,486 |
| 1990 | 9% | $55,693,861 | $56,288,196 | $21,090,151 |
| 1991 | 9% | $57,327,280 | $26,114,849 | $52,302,582 |
| 1992 | 9% | $59,468,234 | $74,722,013 | $37,048,803 |
| 1993 | 8.5% | $55,439,259 | $44,393,400 | $48,094,662 |
| 1994 | 7.50% | $49,661,367 | $45,444,688 | $52,311,341 |
| 1995 | 7.50% | $50,257,848 | $41,935,366 | $60,633,823 |

[4]Amount not available from record.

| 1996 | 7.50% | $51,348,798 | $33,483,322 | $78,499,299 |
| 1997 | 7.50% | $52,844,968 | $34,981,610 | $96,362,657 |
| 1998 | N/A | N/A | N/A | N/A |
| Total | ---- | $492,370,382 | $396,007,725 | $96,362,657 |

It remains to say that Overnite never undertook to repay any part of the principal of the note. When the note came due in 1998, Holding forgave the remaining unpaid interest along with $400 million of the principal and Overnite issued to Holding a new note of $200 million.

2. Starting with the tax year 1988 and in each subsequent year, Overnite accounted for the note to Holding on its corporate excise tax return as a liability, and in 1989 began deducting from its gross income the total amount of interest it claimed it owed for each year. See G. L. c. 63, § 30(4), as amended by St. 1992, c. 133, §§ 401, 595.[5] This had the effect of lowering Overnite's taxable net income[6] apportioned to Massachusetts under G. L. c. 63, § 38(c). So also, treating the note as indebtedness reduced the company's net worth for purposes of calculating the net worth ("non-income") measure of the tax. See G. L. c. 63, § 30(9) (the "net worth of a foreign corporation . . . shall be [a certain percentage, determined by formula,] of the book value of its total assets less its liabilities on the last day of the taxable year"), inserted by St. 1962, c. 756, § 2. For the tax years 1988 through 1993 here in question, the result was a reduction by a total of $569,734 of the tax Overnite would otherwise have had to pay.

In February 1992, the defendant Commissioner of Revenue (commissioner) began auditing Overnite's returns and eventually, on April 21, 1996, the Commissioner sent Overnite a notice of assessment (NOA) for the tax years 1988 through 1990 ($205,440) and on October 3, 1996, an NOA for the tax years 1991 through 1993 ($364,294) (a total of $569,734, exclusive of interest).

---

[5]The statute incorporates by reference the deduction permitted, inter alia, under 26 U.S.C. § 163(a) (1994) ("[t]here shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness").

[6]See G. L. c. 63, § 30(4) ("gross income less the deductions, but not credits, allowable under the provisions of the Federal Internal Revenue Code, as amended and in effect for the taxable year").

Overnite, questioning the assessments, conferred with the commissioner's audit division. This resulted, on March 19, 1996, in issuance by the departmental appeal and review bureau of a letter opinion holding the note did not constitute genuine indebtedness and the assessments were well grounded. The bureau stressed the factors that the note was not issued in consideration of any new funds, the note was unsecured, and the company appeared unable to retire the principal of the note without liquidating a substantial part of its assets. The bureau concluded that any purported interest transfers to Holding necessarily were "excessive" in the sense of G. L. c. 63, § 39A,[7] and properly disallowed as deductions.

Overnite timely filed applications for abatement, which were denied by the commissioner. Appeal to the Appellate Tax Board (board) followed. The board held a hearing on January 7, 1999. The parties tendered a statement of facts. Witnesses for the taxpayer were Diggs and Kimball, through whom sundry exhibits were introduced. The commissioner cross-examined, and entered further exhibits. The board's findings of fact and report, dated August 13, 1999, after analyzing the facts, said in agreement with the appeal and review bureau it was "unpersuaded that any reasonable expectation [of payment] attended the Note transaction here." The board found Holding's failure "to enforce its full and timely interest entitlement at any point over the life of the Note" was strongly "indicative of concern for an equity investment," quoting from *Bordo Prods. Co.* v. *United States*, 476 F.2d 1312, 1325 (Ct. Cl. 1973). Finally, the circumstances attending the note impaired "the credibility of potential business reasons for structuring the Note transaction as

[7]"The net income of a foreign corporation which is a subsidiary of another corporation or closely affiliated therewith by stock ownership shall be determined by eliminating all payments to the parent corporation or affiliated corporations in excess of fair value, and by including fair compensation to such foreign corporation for all commodities sold to or services performed for the parent corporation or affiliated corporations." G. L. c. 63, § 39A, as amended by St. 1934, c. 134. (A parallel provision for a Massachusetts subsidiary appears in G. L. c. 63, § 33.) The court said in *Polaroid Corp.* v. *Commissioner of Rev.*, 393 Mass. 490, 497 (1984): "The first sentence of § 39A mandates correction of the consequences of less than arm's length transactions." See *Commissioner of Rev.* v. *AMIWoodbroke, Inc.*, 418 Mass. 92, 96-97 (1994).

debt." From the board's decision, Overnite takes its appeal to this court. In the discussion which follows, we avail ourselves of the detailed reasoning of the bureau and board.

*Discussion.* In pursuit of the question whether the note was true debt, there is need to consider not only the text but the circumstances of issuance and performance. See *New York Times Sales, Inc.* v. *Commissioner of Rev.*, 40 Mass. App. Ct. 749, 752 (1996); *Alterman Foods, Inc.* v. *United States*, 611 F.2d 866, 872 (Ct. Cl. 1979). It may not be presumed that such an arrangement between subsidiary and controlling parent is automatically disqualified as a debt, see *Kraft Foods Co.* v. *Commissioner of Int. Rev.*, 232 F.2d 118, 124 (2d Cir. 1956), yet the self-dealing involved calls for "close scrutiny," *id.* at 123, in which characterizations appearing on the books should not be blandly accepted.[8] When "the same persons occupy both sides of the bargaining table, form does not necessarily correspond to the intrinsic economic nature of the transaction, for the parties may mold it at their will with no countervailing pull." *Fin Hay Realty Co.* v. *United States*, 398 F.2d 694, 697 (3d Cir. 1968). To the extent of the deviation of the transaction from the core definition of debt, the claim of an actual debtor-creditor relationship is put in question. See *New York Times Sales, Inc.* v. *Commissioner of Rev.*, 40 Mass. App. Ct. at 752-753; *Kraft Foods Co.* v. *Commissioner of Int. Rev.*, 232 F.2d at 123; *P. M. Fin. Corp.* v. *Commissioner of Int. Rev.*, 302 F.2d 786, 789 (3d Cir. 1962). We may accept as such definition "an unqualified obligation to pay a sum certain at a reasonably close fixed maturity date along with a fixed percentage in interest payable regardless of the debtor's income or lack thereof." *Gilbert* v. *Commissioner of Int. Rev.*, 248 F.2d 399, 402 (2d Cir. 1957).

Like other courts in similar situations we circumambulate the transaction to see it from several points of vantage and thus to find its essential nature.

---

[8]In the recent *New York Times Sales* case, 40 Mass. App. Ct. at 752-754, cash transfers from the subsidiary to its parent were held, after consideration of various factors, to be in the nature of dividends in favor of the parent, rather than loans on which interest could have been imputed to the subsidiary under G. L. c. 63, § 39A.

*Acquisition.* Overnite was restructured in 1987 with a purported net worth of (roughly) $1.2 billion, which the draftsmen seem to have tried to justify as the original company's net worth of around $300 million plus the premium of $900 million paid by Union Pacific to acquire the shares of Overnite. No part of Union Pacific's outlay passed to Overnite and the company's economic position was unchanged, as Diggs acknowledged. The result was that the supposed debt of $600 million represented by the unsecured note issued by Overnite in favor of Holding could be supported only by a hope (or weakly grounded expectation) that Overnite would prove so profitable as to bear the burdens of interest and ultimately principal over the ten years to 1998. The risks of underachievement were considerable and could be recalled with sorrow as the nominal obligations fell due. Holding (with Union Pacific standing behind Holding) appears, not in actuality a creditor, but the sole shareholder of Overnite awaiting returns on investment, which may as well be called future "dividends." See *Affiliated Research, Inc.* v. *United States*, 351 F.2d 646, 648 (Ct. Cl. 1965) (if "repayment of . . . advances is dependent upon the success of the recipient corporation, this suggests that the amounts were in fact an equity investment"); *Slappey Drive Indus. Park* v. *United States*, 561 F.2d 572, 581 (5th Cir. 1977) (a "person ordinarily would not advance funds likely to be repaid only if the venture is successful without demanding the potential enhanced return associated with an equity investment").

*Promissory note.* The note in its spare style was blank on a number of points that would be covered by specific provisions in a bona fide note, especially one of this size. And, most remarkably, the maker Overnite was not in fact receiving (borrowing) money, it was simply promising to pay on stated terms. The explanation now offered for leaving the promises without security, reserve, provision for enforcement, and so forth is that these precautions were needless and would be merely formal where "debtor" and "creditor" were closely related — indeed, in practice, one and the same. But this makes the point that the note was not such in truth; at most it was a kind of conduit for

what the very corporate resolution called it, a "dividend" in favor of the initial investor.[9]

Asked whether he knew of any instance where a corporation issued its own unsecured obligations to a parent as a dividend which was then allowed for tax purposes as indebtedness, Kimball cited the aforementioned case of *Kraft Foods Co.* v. *Commissioner of Int. Rev.*, 232 F.2d 118, 124 (2d Cir. 1956). Kimball, however, had not looked into the details. As the board noted, "[I]n that case, by contrast [with the present] . . . the amount of the debt was well within the debtor's capacity to pay" — in fact, the corporation remained current, making all required payments, and, it may be surmised, the debentures involved could have been sold for hard cash. See *Commissioner of Int. Rev.* v. *T. R. Miller Mill Co.*, 102 F.2d 599, 600 (5th Cir. 1939) (corporation's declared surplus distribution to shareholders in form of note absolute in terms with fixed interest rate, corporation remaining current on interest obligations: interest payments held properly deducted). Contrast *Gregg Co. of Del.* v. *Commissioner of Int. Rev.*, 239 F.2d 498, 500-502 (2d Cir. 1956), cert. denied, 353 U.S. 946 (1957) (notes could not be treated as debt for tax purposes where corporation issued notes to family members without receiving new capital and subsequently paid on notes from surplus earnings and only as corporation deemed it advisable).

*Performance.* There has been argument that all that should count was the intention or frame of mind of the parties at the time of the launching of the note. So far as that intention is at all ascertainable, it seems not to help the taxpayer: in argument intention promptly translates into a claim that the parties could have believed Overnite would prosper for an indefinite period at a rate resembling that of the past, before the restructuring. And so we are remitted to what was reasonably foreseeable, and

---

[9] At one point (in a pre-assessment conference request) Overnite preferred to characterize the transaction as a "return of capital" rather than a "dividend." The deviation from debt is clear in any case. See *Affiliated Research, Inc.* v. *United States*, 351 F.2d at 648-649 (unsecured advances made by stockholder to corporation were not loans but investments); *Roth Steel Tube Co.* v. *Commissioner of Int. Rev.*, 800 F.2d 625, 631 (6th Cir. 1986), cert. denied, 481 U.S. 1014 (1987) (the "absence of security for the advances is a strong indication that the advances were capital contributions rather than loans").

thence to what in fact happened. "What may appear to be a debtor-creditor relationship from dealings viewed within a certain span of time may turn out to be a mirage when later transactions are taken into account. The circumstances surrounding disbursements in later years and their cumulative effect may be considered in determining a taxpayer's intent prior to those years." *Alterman Foods, Inc.* v. *United States*, 611 F.2d at 872, quoting from *Estate of Taschler* v. *United States*, 440 F.2d 72, 77 (3d Cir. 1971). As the board remarked, "[t]he extent of the risk was borne out in the irregularity and erratic amounts of interest payments, beginning the first time appellant's obligation fell due." As to the subsequent lamentable history of defaults, the board added, "the long foreseeable risk of non-repayment of the Note was realized when appellant failed to repay or rollover two-thirds of the $600 million amount upon maturity. Indeed the history of default in meeting interest obligations would all but foreclose the prospect of a rollover of the Note by a disinterested lender."

*Third party lender.* Compelled by the view expressed in *Scriptomatic, Inc.* v. *United States*, 555 F.2d 364, 367 (3d Cir. 1977), Overnite states in its brief, "Doubtless the most important factor in analyzing the Note is the evidence that a third party creditor would have made a loan to Overnite on the terms of the Note." What is assumed here is a hypothetical independent lender willing to make a ten-year advance of $600 million in cash to Overnite without exacting security in specific assets of the company (at best the approximately $300 million).[10] Although some loans are made "on signature," see *State St. Bank & Trust Co.* v. *Reiser*, 7 Mass. App. Ct. 633, 634 (1979), the absence of provision for security in a loan of this scale is telltale that a "loan" is not real, see *Affiliated Research, Inc.* v. *United States*, 351 F.2d at 648-649; *Roth Steel Tube Co.* v. *Commissioner of Int. Rev.*, 800 F.2d 625, 631 (6th Cir. 1986);

---

[10]The board wrote, "There is an artificial quality to attempts to equate the issuance of the Note with third-party lending. An arms-length loan would have left Overnite with a substantial amount of cash to devote to business expansion. However, the Note placed Overnite under a heavy interest obligation requiring uninterrupted double-digit growth, but without new cash to fuel the expected performance. This fact makes the Note seem unlike other debts, and casts doubt on reasonableness of expectation of repayment."

and so, also, for the absence of meaningful enforcement mechanisms. See *United States* v. *Snyder Bros. Co.*, 367 F.2d 980, 984-985 (5th Cir. 1966), cert. denied, 386 U.S. 956 (1967); *Texas Farm Bureau* v. *United States*, 725 F.2d 307, 314 (5th Cir. 1984), cert. denied, 469 U.S. 1106 (1985). To this should be added the admission that at no stage, from the beginning, did Overnite have the ability to meet the principal requirements of the note. Prior to the restructuring, Overnite had never earned annual net income as much as the note's nominal interest requirements. "[A] loan is made upon the reasonable assumption that it will be repaid no matter whether the business venture is successful or not," *Cuyuna Realty Co.* v. *United States*, 382 F.2d 298, 301 (Ct. Cl. 1967); that does not appear to have been the case here. It more likely appears that Overnite intended to satisfy its obligations under the note only when and as circumstance conveniently permitted. Agreeing with the board, we think the hypothetical willing lender could not be found in the flesh. The point can also be made by asking whether anyone could be found to buy the existing note from Holding (or Union Pacific) and at what point in time and at what discount.

*Expert witness.* Characteristic of Kimball's testimony was that it made little progress in responding with particulars to the question of the independent lender. Kimball rather spent considerable time showing by various ratios[11] that Overnite's "debt" after the restructuring was not out of proportion to its equity when measured against the like figures for comparable trucking companies. The witness, however, had not paid attention to whether the debt for the other companies resulted from an actual borrowing of cash, or whether there were any instances where the "creditor" was related to or was the counterpart of the "debtor."

Also problematic was Kimball's inclusion in his assessments of some $900 million in unspecified "intangible assets" (representing nearly 70% of Overnite's total claimed value). It

---

[11]The debt-to-equity ratio; current ratio (measuring liquid assets against current liabilities); quick ratio (a more conservative form of the current ratio essentially considering cash and cash equivalents); and the ratio of earnings before interest and taxes to annual interest expenses (a measure of cash flow and the ability of a company to meet interest obligations).

has been observed that "intangible assets . . . have no place in assessing debt-equity ratio unless it can be shown by convincing evidence that the intangible asset has a direct and primary relationship to the well-being of the corporation." *Plantation Patterns, Inc.* v. *Commissioner of Int. Rev.*, 462 F.2d 712, 723 (5th Cir.), cert. denied, 409 U.S. 1076 (1972). The only showing here was to the contrary. The board also was concerned with Kimball's discounting of Overnite's actual unfortunate earnings history (as opposed to the forecasts) and his lack of explanation for Holding's failure to enforce its rights. The board thus found Kimball's opinions largely unpersuasive and of only "limited assistance in resolving the debt vs. equity question" and others at hand. The board's decision to disregard much of Kimball's testimony was amply supported and within its discretion. See *Foxboro Assocs.* v. *Assessors of Foxborough*, 385 Mass. 679, 682-683 (1982); *Hampton Assocs.* v. *Assessors of Northampton*, 52 Mass. App. Ct. 110, 115 (2001).

*Business purpose.* A transaction structured in such a way as to minimize tax comes under suspicion of the tax authorities if it manifests no other substantive purpose. Kimball spoke in general terms about restructuring a corporation so as to achieve a proper relation between equity and debt[12] — this testimony offered to suggest that the Overnite transaction had a business objective which might bear on tax liability. Kimball's observations lose their cogency where so-called "debt" turns out not to be such in reality. As already noted, see note 10, *supra*, were the "debt" here to be taken as genuine, it would impose a dubious burden on the company. In fact the debt was a misnamed or scantily disguised means by which Overnite transferred funds through Holding to Union Pacific to enable this original investor to recoup its equity investment.

---

[12]Kimball suggested that a corporation might restructure as Overnite here did to help its parent achieve a desired return on investment; to realize the theoretically lower cost to the corporation of debt vis-à-vis equity; to limit the amount of capital potentially at risk in the corporation in the event of a catastrophic transportation-related accident; and to obtain a better reflection of the restructured corporation's actual performance. As the board observed, Kimball denied that he knew what Overnite's actual business purposes might have been in structuring the transaction as it did, and he only tangentially tied his academic observations to Overnite's circumstances.

*Conclusion.* The taxpayer having failed to carry its burden of showing that the note constituted indebtedness and the transfers to Holding qualified as deductible interest expense, the decision of the Appellate Tax Board is affirmed.

*So ordered.*