IDC Research, Inc. *vs.* Commissioner of Revenue.

No. 09-P-1533.

Suffolk. May 12, 2010. - November 30, 2010.

Present: Grasso, Brown, & Kafker, JJ.

*Taxation,* Corporate excise; Abatement; Appellate Tax Board: findings; Judicial
review. *Administrative Law,* Substantial evidence. *Corporation,* Subsidiary.
*Words,* "Sham transaction doctrine," "Substantive business activity."

The Appellate Tax Board correctly upheld the Commissioner of Revenue's
refusal to abate a portion of the corporate excise taxes assessed to a parent
corporation on royalty income received by a subsidiary, where the transfer
of a licensing business from the parent corporation to the subsidiary was a
sham transaction that did not involve a new business [353-361], and where
the parent corporation was the beneficial owner of the royalty income dur-
ing the tax years in question [361].

Appeal from a decision of the Appellate Tax Board.

*Richard L. Jones* (*William E. Halmkin* with him) for the tax-
payer.

*Christopher M. Glionna* for Commissioner of Revenue.

Brown, J. IDC Research, Inc., appeals from a decision of the
Appellate Tax Board (board), upholding the refusal of the Com-
missioner of Revenue (commissioner) to abate a portion of the
corporate excise taxes assessed to its parent corporation,
International Data Group (IDG), for the tax years 1992, 1993,
and 1994. IDG disputes that it owes taxes on royalty income
received by IDG Holdings, Inc. (IDG Holdings), an IDG sub-
sidiary incorporated in Delaware.

For the facts, we refer to the board's April 17, 2009, findings
of fact and report. The board concluded that the commissioner
properly reallocated royalty income from IDG Holdings to IDG,
based on the sham transaction and assignment of income
doctrines. We agree with the board that IDG did not sustain its

burden of proving that it was entitled to an abatement of corporate excise taxes on amounts it claimed were earned by IDG Holdings. We address in turn the arguments raised by IDG on appeal.

1. *Sham transaction doctrine.* The board found that the transfer of the "IDG World" logo (world logo) licensing business from IDG to IDG Holdings had no economic substance or business purpose other than tax avoidance, and therefore constituted a sham transaction. See, e.g., *Syms Corp.* v. *Commissioner of Rev.*, 436 Mass. 505, 509-510 (2002); *Sherwin-Williams Co.* v. *Commissioner of Rev.*, 438 Mass. 71, 79-80 (2002). IDG argues that the transfer did not constitute a sham transaction because IDG Holdings was engaged in substantive business activities through owning and managing the world logo, and investing the royalty income, and that the transfer had a valid, nontax purpose in furthering IDG's goal of decentralization.

The standard is well-established. "The question whether or not a transaction is a sham for purposes of the application of the doctrine is, of necessity, primarily a factual one, on which the taxpayer bears the burden of proof in the abatement process" (footnote omitted). *Syms Corp.* v. *Commissioner of Rev.*, 436 Mass. at 511. "We will not disturb the board's decision 'if it is based on substantial evidence and on a correct application of the law.' " *Commissioner of Rev.* v. *Gillette Co.*, 454 Mass. 72, 75 (2009), quoting from *Koch* v. *Commissioner of Rev.*, 416 Mass. 540, 555 (1993). We review the board's findings of fact to determine whether, as matter of law, the evidence is sufficient to support them. *Ibid.* "Our review of the sufficiency of the evidence is limited to 'whether a contrary conclusion is not merely a possible but a necessary inference from the findings.' " *Syms Corp.* v. *Commissioner of Rev., supra* at 511, quoting from *Olympia & York State St. Co.* v. *Assessors of Boston*, 428 Mass. 236, 240 (1998). The credibility of witnesses, weight of the evidence, and inferences to be drawn therefrom are for the board. *Kennametal, Inc.* v. *Commissioner of Rev.*, 426 Mass. 39, 43 n.6 (1997), cert. denied, 523 U.S. 1059 (1998).

The record before us fully supports the board's conclusion that IDG Holdings was not a viable business entity for tax purposes. In the context of the sham transaction doctrine, a viable business entity means "one which is 'formed for a substantial business

purpose or actually engage[s] in substantive business activity.' " *Sherwin-Williams Co.* v. *Commissioner of Rev.*, 438 Mass. at 84, quoting from *Northern Ind. Pub. Serv. Co.* v. *Commissioner of Int. Rev.*, 115 F.3d 506, 511 (7th Cir. 1997). The board, methodically distinguishing the transfers in this case from those found to be legitimate in *Sherwin-Williams Co.* v. *Commissioner of Rev.*, *supra* at 86, rejected IDG's proof that IDG Holdings was anything more than a tax-free conduit for receipt of royalty payments for IDG's use.[1] Based on substantial evidence demonstrating IDG Holdings' lack of substantive business activity or substantial business purpose, the board found that the transfer of the world logo licensing business from IDG to IDG Holdings was a sham.

Focusing on the indicia of substantive economic activity in *Sherwin-Williams Co.* v. *Commissioner of Rev.*, 438 Mass. at 86, upon which the board relied here, IDG first challenges the board's finding that IDG did not actually transfer ownership of the world logo to IDG Holdings. IDG argues that the finding was not based on substantial evidence.

To prove the transfer of the world logo, IDG principally relies on the October 1, 1988, "Consent of Executive Committee" (consent), by which IDG's executive committee adopted a vote to transfer the world logo to IDG Holdings. The consent authorized and directed the officers of IDG "to execute and deliver all documents, and take all action, necessary or desirable to carry out said transfer." The consent itself was the sole document offered by IDG to evince the transfer of the world logo to IDG Holdings, and IDG witnesses failed to identify further actions taken by its officers to accomplish the transfer. Experts for both parties gave opinions regarding the effectiveness of the consent to transfer ownership of the world logo, and the board acted within its discretion to reject the testimony of

[1]The board identified the following features in *Sherwin-Williams Co.* v. *Commissioner of Rev.*, 438 Mass. at 86, that the Supreme Judicial Court relied on to find that the subsidiaries in that case were engaged in substantive business activity: (1) the mark passed to the subsidiaries along with the benefits and burdens of ownership; (2) the subsidiaries contracted with unrelated third parties for use of the mark; (3) the subsidiaries received royalty payments, which they invested with unrelated third parties to earn additional income for their businesses; and (4) the subsidiaries incurred substantial liabilities to unrelated parties and to Sherwin-Williams to maintain, manage and defend the mark.

IDG's expert that nothing more than the consent was needed. See generally *Boston Safe Deposit & Trust Co.* v. *Commissioner of Rev.*, 17 Mass. App. Ct. 326, 329 (1983) (board's prerogative not to believe expert witness). The board's finding that IDG remained the owner of the world logo throughout the tax years in question was supported by substantial evidence, which included the plain language of the consent, and considerable documentary evidence showing that IDG continued to identify itself as the owner and treat the world logo as its own after October 1, 1988.

Indeed, the board found that even assuming that IDG had transferred the world logo to IDG Holdings, the transactions still lacked economic substance or effect because IDG retained full use and control of the world logo and the benefits and burdens of its ownership. See, e.g., *Syms Corp.* v. *Commissioner of Rev.*, 436 Mass. at 508-509 (despite transfer of trademark to subsidiary, substantive business activities connected to mark remained with parent). Our review of the record confirms that the board's findings regarding IDG's continued use of the world logo and identification as its owner, coupled with its failure to identify IDG Holdings as the logo owner during the years in question, were amply supported. IDG's various explanations for its conduct did not require a different result. See *Kennametal, Inc.* v. *Commissioner of Rev.*, 426 Mass. at 46 ("The board might have reached contrary conclusions, but such conclusions are not necessarily inferred from the facts").

IDG also failed to carry its burden of proving that IDG Holdings engaged in substantive business activity during the relevant tax years. From the board's findings, which were fully supported in the record, it appears that IDG Holdings' activities in those years consisted of the receipt of royalty payments in its account at Bank of Delaware, automatic investment with Merrill Lynch when the account reached a certain predetermined level set by IDG Holdings' board of directors,[2] and, in November 1993, the leasing of an unspecified portion of an office suite at

[2]According to the record, the IDG Holdings' board of directors, like its officers, consisted of individuals from IDG and the Bank of Delaware, none of whom were paid by IDG Holdings. IDG Holdings had no employees and paid no salaries.

the Bank of Delaware for $250 per month, which the board found to be a "convenient contrivance." See, e.g., *Syms Corp. v. Commissioner of Rev.*, 436 Mass. at 509. Those activities suggest a business in form only. Compare *Sherwin-Williams Co. v. Commissioner of Rev.*, 438 Mass. at 86 (evidence of "substantive business activity, beyond the creation of tax benefits for Sherwin-Williams was substantial").

Significant on the issue of substantive business activity in *Sherwin-Williams Co. v. Commissioner of Rev.*, 438 Mass. at 81, were the subsidiaries' investments, as well as licensing agreements, with unrelated third parties, earning the subsidiaries substantial additional income for reinvestment in their own businesses. IDG points to IDG Holdings' financial accounts with Bank of Delaware and Merrill Lynch as constituting such third-party activity. While those deposits and investments may represent substantive business activities for the financial institutions that handled them, we concur with the board that merely opening a bank account cannot be characterized as substantive business activity for IDG Holdings, without rendering the tax statutes ineffectual. See generally *Kennametal, Inc. v. Commissioner of Rev.*, 426 Mass. at 46. Compare *Northern Ind. Pub. Serv. Co. v. Commissioner of Int. Rev.*, 115 F.3d at 514 (substantive business activity, albeit minimal, where subsidiary borrowed and loaned funds at a profit, borrowed funds from unrelated third parties, and reinvested profits, over which its parent had no control); *United Parcel Serv. of Am., Inc. v. Commissioner of Int. Rev.*, 254 F.3d 1014, 1018-1019 (11th Cir. 2001) (transfer of parent corporation's business to subsidiary not a sham where it created "genuine obligations enforceable by an unrelated third party" against subsidiary and placed income beyond parent's control).

According to the board's findings, it was IDG, rather than IDG Holdings, that made use of the royalty income received from the foreign subsidiaries. The board's description of IDG Holdings' function as a "passive vessel" through which IDG diverted the royalties paid by its foreign subsidiaries to Delaware was apt. The record shows that during the years in question, IDG withdrew millions of dollars from IDG Holdings' account that IDG characterizes as loans, but that lacked loan documentation, terms, or interest, and were only sporadically and partially

repaid. See generally *Overnite Transp. Co.* v. *Commissioner of Rev.*, 54 Mass. App. Ct. 180, 186 (2002), quoting from *Gilbert* v. *Commissioner of Int. Rev.*, 248 F.2d 399, 402 (2d Cir. 1957) (defining a debt as "an unqualified obligation to pay a sum certain at a reasonably close fixed maturity date along with a fixed percentage in interest"). The board found that by means of these purported loans, IDG retained access to and use of substantial amounts of the royalty income derived from licensing agreements executed between IDG and its foreign subsidiaries, and then assigned to IDG Holdings. Compare *Sherwin-Williams Co.* v. *Commissioner of Rev.*, 438 Mass. at 87-88 (parent relinquished control over monies earned from marks after it assigned them to subsidiaries, which then invested the funds with unrelated third parties).[3]

"When 'the same persons occupy both sides of the bargaining table, form does not necessarily correspond to the intrinsic economic nature of the transaction, for the parties may mold it at their will with no countervailing pull.' " *Overnite Transp. Co.* v. *Commissioner of Rev.*, 54 Mass. App. Ct. at 186 (promissory note between parent and subsidiary lacking security, reserve, or provision for enforcement found merely a conduit for paying a dividend). The board reasonably concluded, based on substantial evidence, that IDG Holdings did not engage in substantive business activity, but instead served only as a means for IDG to divert royalty income from Massachusetts to Delaware.

Finding a lack of substantive business activity on the part of IDG Holdings, the board also considered, and found lacking, a substantive business purpose for the transfer of the world logo licensing business to IDG Holdings. Compare *Sherwin-Williams*

---

[3]In *Overnite Transp. Co.* v. *Commissioner of Rev.*, 54 Mass. App. Ct. at 191, a debt owed by the parent to its subsidiary, evinced by a promissory note with many terms left blank, was determined to be "a misnamed or scantily disguised means by which Overnite transferred funds" to its parent, in order to pay dividends without tax consequences, and thus without substantive business purpose. So too, here, the record provides uncontradicted proof that IDG withdrew many millions of dollars from IDG Holdings' account during the tax years in question, paying no interest on those significant sums, and returning only a portion by the end of the relevant tax period. We contrast with the loan between the parent and subsidiary in *Sherwin-Williams Co.* v. *Commissioner of Rev.*, 438 Mass. at 72, 78 n.5, which was made at the market interest rate and repaid in full the following quarter.

*Co.* v. *Commissioner of Rev.*, *supra* at 89 ("tax motivation is irrelevant where a business reorganization results in the creation of a viable business entity engaged in substantive business activity . . ."). IDG complains that there was no direct evidence to support the board's finding that the transaction was undertaken solely for tax avoidance. The burden, however, was on IDG to prove a purpose other than tax avoidance. *Syms Corp.* v. *Commissioner of Rev.*, 436 Mass. at 512, citing *Casebeer* v. *Commissioner of Int. Rev.*, 909 F.2d 1360, 1365 (9th Cir. 1990) ("taxpayer must show both that transaction was supported by business purpose other than tax avoidance and had economic substance other than creation of tax benefit"). See generally *Boston Professional Hockey Assn., Inc.* v. *Commissioner of Rev.*, 443 Mass. 276, 285 (2005), quoting from *General Elec. Co.* v. *Assessors of Lynn*, 393 Mass. 591, 599 (1984) ("taxpayer bears the burden of persuasion of every material fact" regarding its right to an abatement).

On appeal, IDG claims, as its primary purpose for transfers, the regular business policies and decentralization principles of IDG. As detailed in the board's findings, however, the control IDG maintained over IDG Holdings bore none of the hands-off features that typified its relationship with its other subsidiaries, and the board reasonably found from the evidence that the transfers to IDG Holdings were contrary to and not consistent with the asserted goals. As to IDG's argument that the transfers to a subsidiary would help limit IDG's exposure to liability, the board found the claim not credible; again, it was for IDG to prove, and it was for the board to weigh the evidence and the credibility of the witnesses on that issue.

IDG essentially asks that, for tax purposes, the corporate formality of IDG Holdings' separate existence be recognized, while its own lapses in that regard be overlooked. The undocumented and interest-free loans taken by IDG that went unpaid for long periods, the undocumented transfer of the world logo, the identification of IDG as the world logo owner in registering the world logo for domestic and foreign trademark protection, the identification of IDG as the world logo owner in the 1991 licensing agreement with a Hungarian subsidiary and its assignment to IDG Holdings, IDG's continued use of the

world logo without executing a licensing agreement or paying royalties to IDG Holdings: we are asked to view all of these dealings as inconsequential. Compare *Sherwin-Williams Co.* v. *Commissioner of Rev.*, 438 Mass. at 77-78 (detailing arm's-length dealings between parent and subsidiaries and that "[a]ll corporate formalities were meticulously observed"). But transactions between related companies may be closely scrutinized "to ensure that they have substance as well as form," *id.* at 87, and it was IDG's burden to prove that IDG Holdings' separate corporate form should be respected for tax purposes.

We conclude that the board's findings and conclusions with respect to the sham transaction doctrine were supported by substantial evidence and a correct application of the law.

2. *Transaction involving a new versus existing business.* IDG makes the further argument that the sham transaction doctrine should not be applied in this case, as a matter of law, because the licensing of the world logo was a new business rather than a reorganization of an existing business, and therefore did not constitute a diversion of IDG's income or otherwise reduce IDG's taxes. The distinction presumably derives from the following observation in *Sherwin-Williams Co.* v. *Commissioner of Rev.*, 438 Mass. at 81-82:

> "Sherwin-Williams, on initially going into business, could have organized itself in such a way that its intangible assets (e.g., its marks) were held in a corporation separate from the corporations holding its production facilities and sales operations; the corporation owning the marks could have licensed those marks to its sister corporations; and this arrangement would have been respected by taxing authorities even if the structure were motivated entirely by a desire to minimize Sherwin-Williams's over-all tax burdens."

The court contrasted the initial organizational set-up of a new business with the subsequent reorganization of an existing business, to which the sham transaction applies:

> "In the context of a business reorganization resulting in new corporate entities owning or carrying on a portion of the business previously held or conducted by the taxpayer,

this requires inquiry into whether the new entities are 'viable,' that is, 'formed for a substantial business purpose or actually engaging in substantive business activity.' "

*Id.* at 85-86, quoting from *Northern Ind. Pub. Serv.* v. *Commissioner of Int. Rev.*, 115 F.3d at 511.

IDG does not suggest that IDG, from its inception, created IDG Holdings as a separate corporation to hold its intangible assets.[4] But IDG maintains that because the development and licensing of the world logo constituted a new business, rather than the diversion of an existing business already conducted by IDG, the arrangement did not shift any of IDG's existing income out of State, and so should not be subject to scrutiny as a sham transaction undertaken to avoid Massachusetts taxes. Rather, the argument goes, IDG was entitled to create a new business, and operate it as a separate subsidiary in the State of its choosing, without challenge under the sham transaction doctrine.

We are not persuaded. First, the record makes clear that development and use of the world logo originated with IDG and, accordingly, represented "a portion of the business previously held or conducted by the taxpayer." *Sherwin-Williams Co.* v. *Commissioner of Rev.*, 438 Mass. at 85. It is undisputed that IDG designed the world logo, used the world logo, applied for trademark registration for the world logo, and registered the world logo in foreign jurisdictions, all before the transfers to IDG Holdings.[5] On October 1, 1988, IDG, as the owner of the world logo, entered into the world logo licensing agreements with nine of its foreign subsidiaries, under the terms of which IDG was to receive royalty payments for use of the world logo. Only at that point did IDG assign the licensing agreements to IDG Holdings. Moreover, even after the transfers, only IDG, and not IDG Holdings, entered into a new logo licensing agreement with a foreign subsidiary during the relevant tax years.

---

[4]To the contrary, the board noted that "IDG held thousands of trademarks used by its many subsidiaries, but the World Logo was the only one for which a royalty fee was charged."

[5]In its brief, IDG explained that the reason it registered the world logo in its own name in foreign jurisdictions was because "the initial registrations were made *before* the World Logo licensing business was transferred to IDG [Holdings]."

Second, while IDG argues that there was no tax avoidance to this arrangement, avoidance was amply demonstrated in the record by IDG's interest-free use of the royalty income held in IDG Holdings' investment account, pursuant to the purported loans described earlier. While IDG insists that inter-company loans are commonplace, indebtedness between parent and subsidiary that is intended to be repaid "only when and as circumstances conveniently permitted," is susceptible to inquiry by tax authorities as to its purpose. *Overnite Transp. Co.* v. *Commissioner of Rev.*, 54 Mass. App. Ct. at 190. The board reasonably found that IDG avoided paying taxes on royalty income that it originally was to receive under the licensing agreements, by transferring those agreements to IDG Holdings, and then withdrawing significant sums from IDG Holdings' account for its own use, only a portion of which it repaid during the tax years in question.

On this record, it was appropriate to scrutinize the transfers at issue between IDG and IDG Holdings for form as well as substance. We conclude that the application of the sham transaction doctrine was proper in these circumstances.

3. *Assignment of income.* As a final matter, IDG maintains that the evidence was not sufficient to support the board's finding that IDG was the beneficial owner of the royalty income earned from the world logo licensing agreements. Contrary to IDG's assertion, the board did not rely merely on the fact that IDG was the parent corporation. We are satisfied that the same evidence that demonstrated IDG's control over the assets and income of IDG Holdings, long after the 1988 transfers, supported the board's conclusion that IDG was the beneficial owner of the royalty income during the tax years in question. In accordance with *Commissioner of Int. Rev.* v. *Sunnen*, 333 U.S. 591, 604 (1948), and *Commissioner of Int. Rev.* v. *Banks*, 543 U.S. 426, 434-436 (2005), the board properly ruled that the transfer of the world logo licensing business did not shift the tax liability to IDG Holdings. "It is command of income and its benefits which marks the real owner of property." *Higgins* v. *Smith*, 308 U.S. 473, 478 (1940).

The decision of the Appellate Tax Board is affirmed.

*So ordered.*