## The Talbots, Inc. *vs.* Commissioner of Revenue.

No. 09-P-1931.

Suffolk. September 20, 2010. - March 29, 2011.

Present: RAPOZA, C.J., CYPHER, & GREEN, JJ.

*Taxation,* Corporation, Related corporations, Corporate excise. *Corporation,* Subsidiary, Corporate disregard.

The Appellate Tax Board (board) correctly affirmed the denial by the Commissioner of Revenue (commissioner) of a taxpayer's request to abate corporate excise taxes that were assessed against the taxpayer on the basis of disallowed deductions for royalty payments the taxpayer made to a wholly owned subsidiary for the use of intellectual property, where sufficient evidence supported the board's finding that the commissioner properly disregarded, under the "sham transaction doctrine," the transfer and licensing of the intellectual property between the taxpayer and the subsidiary [161-166]; further, the board correctly affirmed the commissioner's reattribution of the royalty and interest income earned by the subsidiary to the taxpayer, where the taxpayer controlled the intellectual property from which the income was generated, and in fact received substantially all of the income [166].

APPEAL from a decision of the Appellate Tax Board.

*John S. Brown* (*Matthew D. Schnell & Donald-Bruce Abrams* with him) for the taxpayer.

*Andrew P. O'Meara* for Commissioner of Revenue.

RAPOZA, C.J. The Talbots, Inc. (Talbots), appeals from a decision of the Appellate Tax Board (board) affirming the refusal of the Commissioner of Revenue (commissioner) to abate certain corporate excise taxes assessed against Talbots. The contested assessments arise from disallowed deductions for royalty payments made by Talbots to a wholly owned subsidiary for the use of various intellectual property. The board found that the transfer and licensing of the intellectual property between Talbots and its subsidiary constituted a sham that could be disregarded pursuant to the "sham transaction doctrine." We affirm.

*Background.* Talbots is a Delaware corporation headquartered in Massachusetts and engaged in the sale of women's apparel, shoes, and accessories. In 1988, Talbots was sold to Jusco (USA), Inc., and Talbots's trademarks, trade names, and other intellectual property (collectively, marks) were sold to Jusco BV, a wholly owned subsidiary of Jusco (USA), Inc., and leased back to Talbots in return for a royalty payment. In 1993, in anticipation of its initial public offering (IPO), Talbots was advised to reacquire the marks. After discussion between Talbots and outside firms, it was decided that the most advantageous way for Talbots to reacquire the marks was for a wholly owned subsidiary to purchase the marks and license them to Talbots. In 1993, The Chicago Classics, Inc. (TCC), was incorporated in Delaware for this purpose.

Using the proceeds of the IPO, Talbots made a capital contribution to TCC of $1 million and a loan of $102 million. This money was used by TCC to purchase the marks from Jusco BV. Talbots and TCC then entered into an agreement pursuant to which Talbots obtained a nonexclusive license to use the marks in return for an annual royalty payment to TCC based on a percentage of net sales. During the years at issue in this appeal (1994 through 2001), TCC licensed the marks only to Talbots or a Talbots subsidiary, and not to any independent third party.

A Talbots employee advised that the use of debt to capitalize TCC would allow for an easier transfer to Talbots of the money TCC received as royalty payments. As noted, *supra,* debt made up more than ninety-nine percent of TCC's capitalization (a $102 million loan and a $1 million capital contribution). TCC repaid to Talbots ninety-six percent of the royalty payments it received in the tax years at issue in the form of principal and interest on the $102 million loan, payments for Federal income tax liability, dividends, and an undocumented loan of $8.5 million. Other than the royalty payments from Talbots and certain Talbots affiliates, TCC's only source of income was the interest it received when it deposited the royalty payments. The total interest income earned by TCC for the eight years in question amounted to $825,348, a return rate of approximately 0.21 percent.

TCC's business address was located in Illinois. At all times relevant to this appeal, it had no employees. TCC contracted

with two independent contractors: Maureen Doyle, who provided bookkeeping services, and Attorney Suzanne Saxman, who approved expenditures, transferred funds, signed checks, and reviewed the bookkeeping procedures. Doyle received between $200 and $315 per month from TCC during the years at issue. Saxman was not paid directly by TCC, but rather her law firm would bill TCC for her time. A Talbots executive testified that "[t]here is no one there" at TCC to make decisions. Instead, decisions were made by various Talbots employees, who had to approve invoices before Saxman was allowed to make payments.

Based on the foregoing, the commissioner adjusted Talbots's taxable income for tax years 1994 through 2001 by disallowing the deductions Talbots claimed for the royalties it paid to TCC for use of the marks, and by reattributing to Talbots the royalty and interest income earned by TCC. With one exception not before us (A.T.B. Docket No. C266698), the board affirmed the commissioner's denial of Talbots's request for abatement of corporate excise taxes for the years at issue, finding that the transfer and licensing arrangement between Talbots and TCC was a sham transaction. Talbots now appeals pursuant to G. L. c. 58A, § 13.

*Discussion.* This appeal presents two questions, the latter dependent on our answer to the first. First, whether there is sufficient evidence to support the board's finding that the transfer and licensing agreement was a sham transaction and, therefore, whether the commissioner properly disallowed the deductions Talbots claimed for its royalty payments to TCC. Second, if there was sufficient evidence to disallow the deductions, whether it was proper to reattribute to Talbots royalty and interest income earned by TCC during the years at issue.

1. *Sufficiency of the evidence.* The board found that the transfer of Talbots's marks to TCC and Talbots's lease of the marks from TCC "lacked economic substance beyond the creation of tax benefits to Talbots, and therefore was a sham transaction." The board's findings of fact are final and we review only to determine whether there is sufficient evidence to support them. *Syms Corp.* v. *Commissioner of Rev.*, 436 Mass. 505, 511 (2002) (*Syms*). "Our review of the sufficiency of the evidence is limited to 'whether a contrary conclusion is not merely a possible but

a necessary inference from the findings.' " *Ibid.*, quoting from *Olympia & York State St. Co.* v. *Assessors of Boston*, 428 Mass. 236, 240 (1998).

The sham transaction doctrine allows the commissioner "to disregard, for taxing purposes, transactions that have no economic substance or business purpose other than tax avoidance."[1] *Sherwin-Williams Co.* v. *Commissioner of Rev.*, 438 Mass. 71, 79-80 (2002) (*Sherwin-Williams*), quoting from *Syms*, 436 Mass. at 509-510. A viable business entity, within the context of the sham transaction doctrine, is "one which is 'formed for a substantial business purpose or actually engage[s] in substantive business activity.' " *Sherwin-Williams, supra.* at 84, quoting from *Northern Ind. Pub. Serv. Co.* v. *Commissioner of Int. Rev.*, 115 F.3d 506, 511 (7th Cir. 1997). "The question whether or not a transaction is a sham for purposes of the application of the doctrine is, of necessity, primarily a factual one, on which the taxpayer bears the burden of proof in the abatement process." *Syms, supra* at 511 (footnote omitted).

The board's findings here are supported by sufficient evidence. Indeed, the facts of the instant case are similar to the facts in *Syms*, in which the Supreme Judicial Court upheld the board's denial of the parent corporation's abatement applications on the basis of the sham transaction doctrine. Moreover, the present facts contrast with those in *Sherwin-Williams*, in which the Supreme Judicial Court reversed the board's finding that the transfer of intellectual property to a subsidiary constituted a sham transaction.

The parent company in *Syms* formed a subsidiary to hold its intellectual property and paid the subsidiary a royalty for its use. *Id.* at 507. The subsidiary would hold the royalty payment, which was its only income, for a few weeks and then pay it back to the parent in the form of a tax-free dividend. *Id.* at 509.

---

[1]As the Supreme Judicial Court explained in *Sherwin-Williams Co.* v. *Commissioner of Rev.*, 438 Mass. 71, 80 n.6 (2002), the sham transaction doctrine applies to " 'shams in substance,' i.e., transactions that really occurred but are alleged to lack the substance their form represents," as opposed to " 'shams in fact,' i.e., transactions that never occurred." There is no dispute here that the marks were in fact transferred to and are owned by TCC; the question before us is whether this transaction had a substantial business purpose other than tax avoidance.

The subsidiary had only one part-time employee who earned $1,200 per year, and its corporate office was an address rented from an accounting firm. *Ibid.* After the transfer and the license-back, the parent continued to maintain and protect the good will and value of the intellectual property. *Ibid.* The parent also continued to control (and pay for) advertising and was responsible for quality control. *Ibid.* Citing these facts, the *Syms* court affirmed the board's finding that the transfer of the intellectual property to the subsidiary was a sham and could be disregarded pursuant to the sham transaction doctrine. *Id.* at 512-513.

The court in *Sherwin-Williams* reversed the board's finding that the transfer and license of intellectual property between the parent and its subsidiaries constituted a sham transaction, and identified four key facts as evidence of the subsidiaries' substantive business activity. *Sherwin-Williams*, 438 Mass. at 86. First, the benefits and the burdens of owning the intellectual property passed to the subsidiaries. *Ibid.* Second, the subsidiaries "entered into genuine obligations with unrelated third parties for use of the" intellectual property. *Ibid.* Third, the subsidiaries invested the royalty payments they received and earned additional income. *Ibid.* And, finally, the subsidiaries "incurred and paid substantial liabilities to unrelated third parties and [the parent company] to maintain, manage, and defend" the intellectual property. *Ibid.*

In the instant case, as in *Syms*, TCC repaid almost all (ninety-six percent) of the royalty payments it received from Talbots. TCC did not invest the income from Talbots's royalty payments into its business and did not earn any additional income (apart from interest income on the royalty payments at the rate of 0.21 percent). Contrast *Sherwin-Williams*, 438 Mass. at 81 (proceeds from parent company's royalty payments were not returned to parent, but were "retained and invested as part of [the subsidiary's] ongoing business operations, earning significant additional income"). TCC had no employees and Talbots controlled TCC's operations. During the years at issue, TCC never entered into a license agreement with any independent third parties. Contrast *ibid.* ("The subsidiaries entered into nonexclusive license agreements not only with [the parent corporation], but also with unrelated parties"). At all relevant times, Talbots had full use and control of the marks. See *Syms*, 436 Mass. at 509.

See also *IDC Research, Inc.* v. *Commissioner of Rev.*, 78 Mass. App. Ct. 352, 355 (2010) ("the transactions . . . lacked economic substance or effect because [the parent company] retained full use and control of the world logo and the benefits and burdens of its ownership"). Moreover, a Talbots executive admitted that "[t]here is no one" at TCC to make decisions. Instead, decisions, including which bills and expenses TCC should pay, were made by Talbots. Contrast *Sherwin-Williams, supra* at 87-88 (parent company relinquished control over monies it paid to subsidiaries as royalties and subsidiaries paid their own expenses). The fact that TCC maintained a business address but had no employees suggests "a business in form only." *IDC Research, Inc., supra* at 356. Nor does "merely opening a bank account" under the TCC name constitute a substantive business activity. *Ibid.*

The record also contains several letters and memoranda from Talbots employees and outside advisors which reveal that the transfer and licensing arrangement here "was specifically devised as a tax avoidance scheme." *Sherwin-Williams*, 438 Mass. at 80. One of these documents refers to the need "[t]o give this structure credibility" by establishing an office where royalty payments could be mailed and hiring a part-time employee to receive, record, and deposit these payments. In a different document, the sole reason stated for establishing a subsidiary to hold the marks is to receive "a reduced state tax burden." The record also contains a document written by a Talbots employee containing a warning that Talbots and its to-be-formed subsidiary (ultimately, TCC) must remain as separate as possible. The document contains a list of ways that Talbots could avoid unnecessary links to the new subsidiary, including not using "Talbots" in the name and electing board members who are not on the Talbots board. Finally, in a different interoffice memorandum, the same Talbots employee states, "If we cannot give the new company the appearance of operating independently, the states will not view it as operating independently."

Talbots's arguments in support of its claim that it is entitled to deduct the royalty payments made to TCC are unavailing. Talbots first argues that there was a substantial business purpose, aside from tax avoidance, for TCC to acquire the marks and lease them to Talbots: the IPO. This argument is without merit.

There is no dispute that Talbots's desire to facilitate the IPO was a legitimate reason for *it* to acquire the marks. But the record is devoid of any evidence of business purpose, save for a tax benefit, to explain why Talbots chose to acquire the marks through the use of a wholly owned subsidiary. As such, Talbots did not meet its burden of proving a purpose for the transfer of the marks to TCC other than tax avoidance.

Talbots next argues that its arrangement with TCC did not involve an attempt to create a new deduction because Talbots already had been deducting royalty payments it made to Jusco BV before TCC purchased the marks from Jusco BV. This argument also fails. Indeed, regardless of what arrangement existed previously, we are concerned in this appeal only with determining whether there was a business purpose beyond tax avoidance for Talbots, which wanted to acquire the marks from Jusco BV in order to facilitate its IPO, to set up a subsidiary to own the marks. The board found that there was no such purpose and substantial evidence supports that finding.

Citing *Sherwin-Williams*, 438 Mass. at 89-90, Talbots also argues that the board gave improper weight to its motivation for establishing a subsidiary to own the marks. The court in *Sherwin-Williams* held that "tax motivation is irrelevant where a business reorganization results in the creation of a viable business entity engaged in substantive business activity rather than in a 'bald and mischievous fiction.' " *Id.* at 89, quoting from *Moline Properties* v. *Commissioner of Int. Rev.*, 319 U.S. 436, 439 (1943). Here, the board found, and the evidence supports, that TCC was not a viable business entity engaged in substantive business activity apart from the creation of tax benefits for Talbots. Therefore, Talbots's tax motivation was relevant and the board did not err in citing it as one factor, of several, in support of its finding that the transfer and license back of the marks was a sham transaction.

There is no question that it is permissible to engage in tax planning to reduce one's tax burden. See *id.* at 81. But "whether a transaction that results in tax benefits is real, such that it ought to be respected for taxing purposes, depends on whether it has had practical economic effects beyond the creation of those tax benefits." *Id.* at 85. For the reasons stated, we agree with the board's finding that "the transaction whereby TCC

acquired and then licensed the Talbots Marks lacked economic substance and business purpose aside from state tax avoidance." As such, the commissioner properly disallowed the royalty payment deductions claimed by Talbots for tax years 1994 through 2001.

2. *Reattribution of income to Talbots.* Having answered the first question — whether the sham transaction doctrine was properly invoked in disallowing the royalty payment deductions claimed by Talbots — in the affirmative, we turn now to the question whether it was proper to reattribute certain income earned by TCC to Talbots. The income at issue is the investment income that TCC earned from investing the royalty payments it received and also income from royalty payments received by TCC from Talbots affiliates (but not Talbots itself). The board held that "[b]ecause the Talbots Marks were still controlled by Talbots, the income that their royalties generated, including any investment income earned from investments pursuant to Talbots's dictate, was also taxable to Talbots."

Talbots argues that TCC is the legal owner of the marks and, therefore, any income derived from ownership of the marks can be attributed only to TCC. This argument is inconsistent with our conclusion that the board properly found that TCC's acquisition and ownership of the marks was a sham within the meaning of the sham transaction doctrine. As such, TCC was properly disregarded as the owner for tax purposes.

The board correctly reattributed the interest and royalty income to Talbots, the beneficial owner of that income for the tax years at issue. Having disregarded TCC's corporate form, the board properly treated Talbots, the parent company, as if it owned the marks because Talbots both controlled them and, in fact, received substantially all of the income generated by the marks. Indeed, "[i]t is command of income and its benefits which marks the real owner of property." *IDC Research, Inc.*, 78 Mass. App. Ct. at 361 (also applying sham transaction doctrine), quoting from *Higgins* v. *Smith*, 308 U.S. 473, 478 (1940).

*Decision of Appellate Tax Board*
*affirmed.*