DAVID CASTRICONE & another[1] vs. DAVID A. MICAL
& another.[2]

No. 08-P-184.

Essex. December 9, 2008. - July 2, 2009.

Present: GRASSO, KATZMANN, & SIKORA, JJ.

*Trade Name. Consumer Protection Act,* Trade name, Unfair or deceptive act,
Damages, Attorney's fees. *Damages,* Consumer protection case, Attorney's
fees.

In a civil action, the judge properly found the defendant liable for common-
law trade name infringement, where the evidence was sufficient to establish
that the plaintiff's trade name had acquired a secondary meaning [593-597],
and where the defendant knew that the plaintiff had incorporated his busi-
ness under the name before the defendant purchased his business from a
third party, who had acquiesced in the plaintiff's appropriation of the name
[597]; further, the evidence supported the judge's finding that the third
party did not sell his business name to the defendant as an element of the
defendant's asset purchase [597-600].
In a civil action, the judge properly found that the defendant's infringement of
the plaintiff's trade name constituted unfair or deceptive conduct within
the meaning of G. L. c. 93A, §§ 2 and 11 [600-601]; further, the judge's
computations of compensatory damages fell well within the range of a
reasoned approximation [601-602]; finally, the judge's award of attorney's
fees appropriately rested on both trial and pretrial preparation and
performance, and given that the preparation of the G. L. c. 93A claim was
indistinguishable from the work on the other theories of recovery, the
judge properly treated the entire work as an indivisible contribution
[602-605].

CIVIL ACTION commenced in the Superior Court Department on
November 9, 2005.

The case was heard by *Richard E. Welch, III*, J.

*Eugene S. O'Brien* for the defendants.

*Denise A. Brogna* for the plaintiffs.

[1]Castricone Roofing and Siding, Inc.

[2]Castricone Construction, LLC.

SIKORA, J. This appeal presents questions of liability and remedy for infringement of a common-law trade name. The same allegations generated a parallel claim of unfair or deceptive conduct within the meaning of G. L. c. 93A, §§ 2 and 11. The dispute arises from the development of competing businesses owned by members of an extended family.

*Factual background.* At the conclusion of a three-day bench trial, the evidence amply supported the following findings by the Superior Court judge. From 1950 onward Mario Castricone (Mario) built a reputable roofing and siding business in the greater Lawrence area. He named it "Castricone Roofing and Siding," but never incorporated it and never registered the name. He conducted the business until 2004.[3]

During the 1970's Mario employed, and taught the roofing and siding business to, two younger men: his son David Castricone (David) and David Mical, the husband of Mario's daughter Karen. From 1977 to 2004, David Mical periodically worked with Mario as an independent contractor.

From 1976 to 1986, Mario's son David ran his own similar but separate business under the identical name of "Castricone Roofing and Siding." Mario did not object to David's use of the name. They sometimes worked together. Both of them typically performed jobs in the area of greater Lawrence. In 1987, David incorporated his business in New Hampshire under the name "David Castricone Roofing and Siding, Inc." He still occasionally used the name "Castricone Roofing and Siding." In 1997, David incorporated his business in Massachusetts under the name of "Castricone Roofing and Siding, Inc.," without Mario's knowledge or consent. Mario first learned of that incorporation in December, 2003, and was distressed by it. David's action appears

---

[3]Mario testified without contradiction to the following circumstances. Over the decades he had advertised regularly in Lawrence's main newspaper and the Yellow Pages telephone directory. For thirty years he had distributed to customers pens labeled with the business name. His workers wore shirts bearing the company name. His work force had averaged between twelve and twenty-five laborers. Before his retirement in 2004, annual sales volume had averaged approximately $1 million. He had received certificates of achievement from two industry suppliers in recognition of his fifty years of operation and four annual commendations from a market survey publication during the period 2000-2003.

to have violated G. L. c. 155, § 9 (prohibiting a corporation's assumption of a name of an entity carrying on business in the Commonwealth without that entity's written consent). However, Mario took no action against David's incorporation.

In August, 2004, Mario sold the assets of his "Castricone Roofing and Siding" to his daughter Karen and son-in-law David Mical (the Micals). The itemization of assets included "[g]oodwill" for payment of one dollar, but did not specifically include the company name.[4] Before the sale, the Micals on three occasions requested permission from David to use the name. He refused. They used it nonetheless, primarily in telephone book advertisements and on the Internet.

*Litigation.* In November, 2005, the plaintiffs, David Castricone and his corporation (hereafter, "plaintiffs"), sued David Mical and his corporation, Castricone Construction, LLC ("the Mical parties"), upon claims, among others, of trade name infringement and unfair business practices in violation of G. L. c. 93A, §§ 2 and 11, and in April, 2006, obtained a preliminary injunction against the Mical parties' use of the name "Castricone Roofing and Siding."[5] At the close of trial in July, 2007, the judge found the defendant Mical parties liable for both common-law trade name infringement and unfair conduct under G. L. c. 93A, §§ 2 and 11. He permanently enjoined the Mical parties' use of the name, and awarded compensatory damages of $35,270 and attorney's fees of $43,000 to the plaintiffs. The Mical parties have appealed from the judgment as to both liability and relief upon grounds of insufficient evidence of infringement and c. 93A liability, and insufficient evidence of the awarded amounts of damages and attorney's fees.

*Common-law liability.* Trade name infringement generates

---

[4] The specified assets consisted of three trucks and numerous categories of tools and equipment. The listed purchase price was one dollar for the itemized "[f]urniture, fixtures and equipment and vehicles" and one dollar for a separate line item entitled "Goodwill." A separate provision read: "Seller shall be paid $400 per week for as long as the Buyers run the business." Mario testified that he had received those payments for two years from the sale date (August 1, 2004) but had discontinued or waived them as the business declined.

[5] The Mical parties asserted counterclaims for unfair competition and intentional interference with advantageous business relations (the alleged diversion of their customers). At the conclusion of trial, the judge found the evidence of the counterclaims insufficient and entered judgment against them.

several wrongs: the violator's misappropriation of the unearned benefit of the established name by diverted sales ("palming off" the alternate goods or services under its identity); the diminution of the established reputation by similar or inferior goods or services ("dilution" of its reputation); and the deception of the consumer. See, e.g., *Monroe Stationers & Printers, Inc.* v. *Munroe Stationers, Inc.*, 332 Mass. 278, 280 (1955); *Hunt Potato Chip Co.* v. *Hunt*, 340 Mass. 371, 374 (1960); *Datacomm Interface, Inc.* v. *Computerworld, Inc.*, 396 Mass. 760, 769, 772 (1986); *Professional Economics, Inc.* v. *Professional Economic Servs., Inc.*, 12 Mass. App. Ct. 70, 79 (1981); Restatement of Torts § 712 comments b & g, § 717 comment b, and § 730 comment a (1938).

Independently of statutory and regulatory systems of incorporation and registration, Massachusetts common law has long protected the value of a trade or business name imbued with a "secondary meaning." See *American Waltham Watch Co.* v. *United States Watch Co.*, 173 Mass. 85, 85-86 (1899); *Monroe Stationers & Printers, Inc.* v. *Munroe Stationers, Inc.*, 332 Mass. at 280; *Hunt Potato Chip Co.* v. *Hunt*, 340 Mass. at 374, and cases cited; *Planned Parenthood Fedn. of America, Inc.* v. *Problem Pregnancy of Worcester, Inc.*, 398 Mass. 480, 485 (1986). A "secondary meaning" is a distinctive association in the minds of the consuming public between an otherwise plain name and a singular source of a product or services. *Id.* at 485-486, citing McCarthy, Trademarks and Unfair Competition §§ 15:1(A), 15:2 (2d ed. 1984).

The acquisition of secondary meaning is a question of fact. *Planned Parenthood, supra* at 486. The burden of proof is on the party seeking to protect the trade name. *Ibid.* We consider a "variety of factors in determining whether words . . . have acquired secondary meaning." *Ibid.* They include the length of use of the name, similarity of names, similarity of products, "classes of prospective purchasers, strength of mark [or name], and evidence of actual confusion." *Ibid.*

In particular, the presence or probability of confusion between names will qualify as irreparable injury warranting injunctive relief because the actual or potential harm to the innocent party's commercial reputation and good will will often prove incapable

of reliable measurement.[6] See, e.g., *Monroe Stationers & Printers, Inc.* v. *Munroe Stationers, Inc.*, 332 Mass. at 280.

The plaintiffs presented evidence and the judge made findings under the criteria necessary for establishment of secondary meaning. See *Hunt Potato Chip Co.* v. *Hunt*, 340 Mass. at 374 ("master did not expressly state that the plaintiff's trade name had acquired a secondary meaning," but court concluded that acquisition of secondary meaning was "implicit in his findings"). The factors considered were the length of use and strength of the name allegedly infringed upon; the similarity of the parties' trade names, products, and markets; and consumer confusion between the parties. See *Planned Parenthood Fedn. of America, Inc.* v. *Problem Pregnancy of Worcester, Inc.*, 398 Mass. at 486.

We consider first the strength of the name "Castricone Roofing and Siding" and the length of use by David. Mario Castricone began to use the name in 1950. He advertised under the name in both the telephone book and the Lawrence Eagle Tribune newspaper. While Mario operated his business under the name, his work accrued a strong reputation in the greater Lawrence area. David began to use the name in 1976 with Mario's knowledge. Like his father, David generally worked in the greater Lawrence area and cultivated a positive business identity in that region over the years. At the time of trial, David had used the name for almost thirty years and had contributed a substantial amount of good will to it. The Micals, at the time of trial, had

---

[6]General Laws c. 110H, § 13, inserted by St. 2006, c. 195, § 2, addresses injunctive relief for trade name infringement: "Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark registered under this chapter, or a mark valid at common law, or a trade name valid at common law, shall be a ground for injunctive relief notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services." Before St. 2006, c. 195, § 2, became effective on October 30, 2006, the text of G. L. c. 110H, § 13, appeared in G. L. c. 110B, § 12. Had the parties raised it, G. L. c. 110B, § 12, would have been the statute applicable here because the events at issue took place prior to October 30, 2006.

We do not consider the significance of the statute because neither party has invoked it at any stage of this litigation. We note, though, that where parties raise Federal and State statutory trade name infringement claims, a conclusion of common-law trade name infringement can obviate the need for consideration of the statutory claims. *Planned Parenthood Fedn. of America, Inc.* v. *Problem Pregnancy of Worcester, Inc.*, 398 Mass. at 485 n.6.

used the name for only about three years, since their purchase of the assets of Mario's business in 2004.

A further indicium is the similarity between the opposing parties' trade names, products, and markets. They have used the same words, "Castricone Roofing and Siding." David at times called his business "David Castricone Roofing and Siding." After their purchase of the business assets from Mario, the Micals registered their business as "Castricone Construction, LLC." However, both sides then advertised under the name "Castricone Roofing and Siding." Their products and markets were also very similar, if not exactly the same. Both specialized in roofing and siding. For the most part, both operated in the greater Lawrence area.

The final criterion is the probability of customer confusion between the two businesses. The trial judge made detailed findings on this issue. We concentrate on the period after August, 2004, following Mario's sale to the Micals. Any pre-August, 2004, confusion between Mario's and David's businesses is not attributable to the Micals. Multiple witnesses testified at trial to their confusion as a result of the advertisements for the two businesses in telephone books. Some contacted the Micals by mistake in an attempt to contact David. Others contacted David in an attempt to contact the Micals. The trial judge found that the Micals' use of "Castricone Roofing and Siding" had caused confusion between the two businesses and had resulted in lost profits for David's business. Those findings are supported and not clearly erroneous.

These elements of evidence strongly support the finding that David's use of the name "Castricone Roofing and Siding" had acquired a secondary meaning. The trial judge correctly granted the permanent injunction. See *Monroe Stationers & Printers, Inc.* v. *Munroe Stationers, Inc.*, 332 Mass. at 280. Compare *Hunt Potato Chip Co.* v. *Hunt*, 340 Mass. at 374-375. "[T]he gravamen of an unfair competition claim is the likelihood of consumer confusion as to the source of the goods or services." *Datacomm Interface, Inc.* v. *Computerworld, Inc.*, 396 Mass. at 769. "One who has established a reputation in a certain commercial field may compel a newcomer to take reasonable precautions in the use of his name to prevent actual or probable deception of the

public and harm to the one first in the field." *Staples Coal Co. v. City Fuel Co.*, 316 Mass. 503, 507 (1944). Here the Micals' use of the name "Castricone Roofing and Siding" caused substantial confusion between the two businesses. David had long preceded them into the field and possessed the legal advantage of the established identity against the newcomer. See *American Waltham Watch Co. v. United States Watch Co.*, 173 Mass. at 87 (Holmes, J.) ("the name of a person may become so associated with his goods that one of the same name coming into the business later will not be allowed to use even his own name without distinguishing his wares"). See also *Datacomm Interface, Inc. v. Computerworld, Inc.*, supra at 772.

In addition to David's proof of secondary meaning, the permanent injunction and the Micals' liability for common-law trade name violation appear valid for two other reasons. First, the Micals knew that David had incorporated his business under the name before they purchased Mario's business. See *Blanchard Importing & Distrib. Co. v. Charles Gilman & Son, Inc.*, 353 F.2d 400, 401 (1st Cir. 1965), cert. denied, 383 U.S. 968 (1966) ("[a]s between conflicting claimants, it is well settled that the right to use the same mark is based on priority of appropriation"). They should have known that their purchase did not include the specific asset of the business name, both because of David's refusal and because of the absence of the name from the purchase and sale agreement. Second, Mario had acquiesced in David's appropriation of the name through (i) permitted longtime use, (ii) passive reaction to the discovery of the 1997 incorporation, and (iii) omission of the name from the itemization of assets purchased by the Micals. It is significant that Mario did not transfer to the Micals any chose in action which he may have had against David.[7]

In a conclusory paragraph of their brief, the Micals contend

---

[7]As discussed above, David's incorporation of his business in Massachusetts under the trade name "Castricone Roofing and Siding, Inc.," appears to have violated G. L. c. 155, § 9 (prohibiting a corporation's assumption of a name of an entity carrying on business in the Commonwealth without that entity's written consent). Furthermore, Mario may have been able to achieve injunctive relief against David's use of the name. See G. L. c. 155, § 9; G. L. c. 110B, § 12 (as in effect prior to October 30, 2006 [the effective date of St. 2006, c. 195, § 2]); note 6, *supra*.

that Mario did sell his business name to them as an element of the asset purchase agreement of August, 2004. The trial judge made the factual finding that the sale of the name had not occurred. For the following reasons, that finding is supportable and not "clearly erroneous" within the meaning of Mass.R.Civ.P. 52(a), as amended, 423 Mass. 1402 (1996). The agreement contained a line item for "[g]oodwill" valued at one dollar. No further elaboration appeared. "[The value of good will] is derived from a number of sources, including an identifiable trade name and location, a favorable reputation among customers, and good relations with sources of financing, suppliers, or others whose favor may have a positive impact on the business." *Marchand* v. *Murray*, 27 Mass. App. Ct. 611, 613 (1989). It is "generally understood to mean the advantage that accrues to a business on account of its name, location and reputation, which tends to enable it to retain the patronage of its old customers." *Murray* v. *Bateman*, 315 Mass. 113, 115 (1943). Under the agreement, the Micals were receiving as elements of good will (1) Mario's business office and address, and (2) his continued employment as a valuable connection to suppliers and customers.

In the usual circumstance of a sale of a business or business assets between an independent seller and buyer dealing at arm's length in the open market, good will presumably passes with the other assets and includes the business name even in the absence of specific designation. *Canadian Club Bev. Co.* v. *Canadian Club Corp.*, 268 Mass. 561, 568 (1929). *Abrams* v. *Liss*, 53 Mass. App. Ct. 751, 754 (2002). However, the degree of good will transferred can become a disputed question of fact. *Id.* at 755. In our case, the transfer of unelaborated good will occurs not between independent bargainers but rather between family members with a history of dealings and disagreement over use of a trade name.

The trial judge observed that the asset sale agreement in these circumstances called naturally for specific treatment of the trade name but that it omitted any reference to it. He was entitled to rule the omission to be an ambiguity. See *Berkowitz* v. *President & Fellows of Harvard College*, 58 Mass. App. Ct. 262, 270 (2003); *Diamond Crystal Brands, Inc.* v. *Backleaf, LLC*, 60 Mass. App. Ct. 502, 504-505 (2004); *Quinn* v. *Mar-*

*Lees Seafood, LLC*, 69 Mass. App. Ct. 688, 695 (2007) (all characterizing the determination of the presence of an ambiguity in a contract as a question of law for the judge). A judge determines the existence of an ambiguity from an inspection of the text of the entire contract. *Bank* v. *Thermo Elemental Inc.*, 451 Mass. 638, 648-649 (2008). Language supporting "a reasonable difference of opinion as to the meaning of the words employed and the obligations undertaken" constitutes an ambiguity. *Id.* at 648, and cases cited. In this instance, two textual sources create the ambiguity. First, while the agreement specifically itemized the transferred physical assets under sale, see note 4, *supra*, it left the asset of "[g]oodwill" undifferentiated. Second, and more telling, Mario reserved the right to engage in competition with the Micals' enterprise. That reservation raises the inference that he was not selling his original business name.[8] It illustrates, also, that a word seemingly unambiguous in isolation can become arguable in the broader context of an entire contract.

Once the judge identified an ambiguity, he was entitled to resolve it by evaluation of extrinsic evidence of the parties' circumstances and intentions at the time of formation of the contract. See *Shea* v. *Bay State Gas Co.*, 383 Mass. 218, 222-223 (1981), and cases cited; *Wood* v. *Roy Lapidus, Inc.*, 10 Mass. App. Ct. 761, 764 (1980); *Parrish* v. *Parrish*, 30 Mass. App. Ct. 78, 86-87 (1991) (holding the word "merged" to be ambiguous in a separation agreement); *Haverhill* v. *George Brox, Inc.*, 47 Mass. App. Ct. 717, 720 (1999) (same for the phrase "effective upon approval" in a public works subcontract). The judge found explicitly that the trade name was conspicuous by its absence from the agreement because it had been a matter of contention

---

[8]By initialed deletions, Mario and the Micals eliminated from the prepared agreement one paragraph transferring his "licenses, permits and approvals" for business operations to them, and another covenanting not to engage in the business directly or indirectly for five years within a radius of five miles of the Micals' business.

Immediately after the deletion appeared the following provision:

"*VI. Payments*

"The purchase price shall be allocated as follows:

"Furniture, fixtures and equipment and vehicles  $1.00

"~~Covenant not to compete~~ [deleted] [initials]  ~~$1.00~~

"Goodwill                                          $1.00"

between David and the Micals, and that Mario would have "explicitly referenced" it if he were transferring it.[9] The judge found further that the Micals understood that they were not receiving the name, as evidenced by the fact that (a) David had refused to yield it to them, and (b) in October, 2004 (three months after execution of the agreement with Mario), they had incorporated the business under the name of "Castricone Construction, LLC" (without objection from David).[10] The judge observed the testimony and demeanor of all the main participants (Mario and David Castricone and Karen and David Mical). Unless "clearly erroneous," his front-line findings of their credibility and intentions are controlling. See *New England Canteen Serv., Inc.* v. *Ashley*, 372 Mass. 671, 675 (1977). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Edinburg* v. *Edinburg*, 22 Mass. App. Ct. 199, 203 (1986), quoting from *Anderson* v. *Bessemer City*, 470 U.S. 564, 573-574 (1985).[11]

*Chapter 93A liability.* The judge correctly concluded that the Mical parties' telephone book advertisements as "Castricone Roofing and Siding" throughout the year 2005 caused harmful confusion to David's business and qualified as wrongdoing under G. L. c. 93A, §§ 2 and 11. As the standard for an unfair or deceptive practice, we ask, inter alia, whether the conduct falls within

---

[9]The dispute presented Mario with a father's dilemma: a choice between the adversary positions of two children. While he testified to the intention to transfer his trade name to the Mical parties, the trial judge found the omission of that specific term from the agreement more telling than Mario's retrospect. Mario's testimony on the subject was brief. In the litigation his formal posture remained neutral. He did not join the suit as a party on either side.

[10]See *Pittsfield & N. Adams R.R.* v. *Boston & Albany R.R.*, 260 Mass. 390, 398 (1927).

[11]Some additional equitable circumstances support the judge's determination. David had been working under the trade name since the mid-1970's and had contributed significantly to its repute. Mario had not assigned any rights or choses in action against David to the Micals. The purchase price for the "[g]oodwill" was nominal. The Micals' position would have permitted them to compete with David under two business names containing the word "Castricone." These circumstances do not add up to condonation of David's unilateral incorporation of the name. Still, Mario took no formal action, inferably because he preferred family peace to litigation. For a short history of equitable protection of family trade names, see comment, The Family Name Dilemma: A Question of "Fairness," 8 B.C. Indus. & Com. L. Rev. 319, 322-330 (1967).

the zone or "penumbra of some common-law, statutory, or other established concept of unfairness; . . . [and] whether it causes substantial injury to consumers (or competitors . . .)." *PMP Assocs.* v. *Globe Newspaper Co.*, 366 Mass. 593, 596 (1975). See *Heller Financial* v. *Insurance Co. of N. America*, 410 Mass. 400, 408 (1991); *Professional Economics, Inc.* v. *Professional Economic Servs., Inc.*, 12 Mass. App. Ct. at 80. The supported findings of the common-law violation will sustain the findings of the statutory violation in the present circumstances.[12] See *R.J. Toomey Co.* v. *Toomey*, 683 F. Supp. 873, 879 (D. Mass. 1988) ("the essential element of the action under [G. L. c.] 93A, §§ 2, 11, is that defendant's use of a mark caused confusion among customers as to the source of the plaintiff's product"). "A judge's determination that a defendant engaged in an unfair or deceptive act in violation of c. 93A is a factual finding which must stand unless clearly erroneous." *Kitner* v. *CTW Transp., Inc.*, 53 Mass. App. Ct. 741, 747-748 (2002).[13]

*Damages.* The Mical parties challenge the amount of compensatory damages awarded by the judge. Of the total $35,270, he attributed $5,000 to profits lost by diversion of a specific job from David's business as the result of a customer's confusion caused by the Micals' telephone book advertisements. He assigned the $30,270 remainder to the value of time required by David, his office manager, and his secretary to address problems created by confusion between the two businesses.

The lost customer testified that she had intended to bring a siding project to David Castricone, had mistakenly contacted David Mical instead, and had then given the job to a third

[12]The common-law wrongdoing permits, but does not compel, a finding of c. 93A misconduct. See, e.g., *Mechanics Natl. Bank of Worcester* v. *Killeen*, 377 Mass. 100, 108-110 (1979); *Linkage Corp.* v. *Trustees of Boston Univ.*, 425 Mass. 1, 27-28, cert. denied, 522 U.S. 1015 (1997); *Greenstein* v. *Flatley*, 19 Mass. App. Ct. 351, 356 (1985) (common-law, equitable, and c. 93A standards can operate independently).

[13]The trial judge's finding and conclusion as to the inappropriateness of multiple damages under G. L. c. 93A, § 11, also will stand. That sanction requires "willful and knowing" wrongdoing. The judge found that David Mical did not act with that degree of intent but rather with a belief of entitlement to the name of the business purchased from Mario. As the direct observer of the witnesses, the judge is the arbiter of credibility. See Mass.R.Civ.P. 52(a); *Ginsberg* v. *Blacker*, 67 Mass. App. Ct. 139, 140 n.3 (2006), and cases cited.

contractor when Mical could not accommodate her schedule. The judge credited David Castricone's testimony that he could have met the schedule and would have netted a profit of $5,000.

As to the value of lost business time, David, his office manager (his wife), and their secretary testified that, through the span of late 2004 to mid-2007, communications from prior, present, and prospective customers required their efforts to cure confusion about the businesses. In particular they reported the need to address complaints or inquiries about prior jobs and the need to determine the identity of the prior jobs as the work of Mario's business, David's business, or the Micals' company. David, the office manager, and the secretary estimated their average weekly allocation of time for such work, their hourly rate of compensation, and a resulting total value of diverted time for the several years in question. The trial judge reduced their proposed values by fifty percent with the observation that confusion between Mario's and David's businesses was not attributable to the Micals.

Both categories of damages turned heavily on the credibility of the witnesses. The judge's findings therefore deserve "the utmost deference." *Ginsberg* v. *Blacker*, 67 Mass. App. Ct. 139, 140 n.3 (2006). A reasonable approximation of compensatory damages is permissible in cases of business torts in which close measurement is impossible and some indefiniteness is attributable to the wrongdoer's conduct. See *Air Technology Corp.* v. *General Elec. Co.*, 347 Mass. 613, 626-627 (1964); *Herbert A. Sullivan, Inc.* v. *Utica Mut. Ins. Co.*, 439 Mass. 387, 413 (2003); *Ricky Smith Pontiac, Inc.* v. *Subaru of New England, Inc.*, 14 Mass. App. Ct. 396, 426 (1982). The judge's computations fell well within the range of a reasoned approximation.

*Chapter 93A attorney's fees.* Pursuant to § 11, the judge awarded fees of $43,000 to the plaintiffs. At the conclusion of trial, he "credit[ed] the testimony of legal fees . . . totaling $43,000 . . . [as] reasonable in amount given the time and extent of the trial and the preceding motions and preparations for the trial." The formal evidence of David's expenditures for litigation consisted of the testimony of his office manager that the business had an outstanding bill of $11,000 for legal services, which it intended to pay, and had spent $2,200 for investigative

services in support of the litigation. The judge excluded (as a proffered exhibit) a written summary of additional fees already paid to counsel. Direct testimony did not fill the gap left by the excluded written summary.

The Micals challenge the awarded amount of $43,000 upon grounds that direct evidence at trial did not substantiate it by testimony or documentation and that the judge failed to apportion that amount downward to reflect the failure of several causes of action or claims asserted by the plaintiffs in the original complaint.

The absence of specific trial testimony does not negate a c. 93A fee award. An evidentiary hearing is unnecessary in the case in which the judge awarding fees has served as the trial judge and observed directly the quality and quantity of counsel's preparation and skill. That "firsthand knowledge" enables the judge to assess the objective worth of the legal services rendered. *Heller* v. *Silverbranch Constr. Corp.*, 376 Mass. 621, 630-631 (1978). The trial judge "is in the best position to determine how much time was reasonably spent on a case, and the fair value of the attorney's services." *Fontaine* v. *Ebtec Corp.*, 415 Mass. 309, 324 (1993) (discussing fee computation under G. L. c. 151B as a process "analogous" to that under c. 93A). See *Twin Fires Inv., LLC* v. *Morgan Stanley Dean Witter & Co.*, 445 Mass. 411, 431 (2005) (expressing deference for the trial judge's "firsthand knowledge of the details and complexity of the case"). On review, that computation enjoys the latitude of an exercise of discretion. *Berman* v. *Linnane*, 434 Mass. 301, 302-303 (2001).[14]

---

[14]Under the preferable method of c. 93A fee determination, the applicant would furnish the trial judge, by testimony or documentation, as the judge might direct, a verified itemization of the fees including (1) biographical qualification of counsel describing education, training, experience, and professional activities and achievements in support of a proposed hourly billing rate in the pertinent market; and (2) chronological time sheets specifying services, dates, and the amounts of time taken for those services. The pertinent market rate is "the average rates in the attorney's community for similar work by attorneys [with similar] years' experience." *Stratos* v. *Department of Pub. Welfare*, 387 Mass. 312, 323 (1982). This information should enable the trial judge to apply a lodestar measurement: the multiplication of a fair market hourly rate for the attorney's services by the amount of reasonably spent time. *Id.* at 322. *Fontaine* v. *Ebtec Corp.*, 415 Mass. at 325. *Stowe* v. *Bologna*, 417 Mass. 199, 203-204 (1994). *Twin Fires Inv., LLC* v. *Morgan Stanley Dean Witter & Co.*, 445 Mass. at 429-430. The lodestar computation of a reasonable

Here the judge rested his award on both trial preparation and performance (direct examination of ten witnesses and introduction of thirty-seven exhibits), and the pretrial record, including counsel's achievement of an important preliminary injunction covering the fifteen months before trial.

The judge did not mistakenly fail to apportion downward the fee award by reason of the plaintiffs' failure to achieve judgments on all six of the original counts or claims of the complaint. If a successful c. 93A claim is separable from the accompanying unsuccessful claims, a judge should limit the award to the c. 93A work. *Hanover Ins. Co.* v. *Sutton*, 46 Mass. App. Ct. 153, 176-177 (1999). However, if the same primary conduct or chain of events creates both the c. 93A claim and the separate claims, and if apportionment of the legal work is not feasible, the judge may treat the entire work as an indivisible contribution to the c. 93A accomplishment. *Columbia Chiropractic Group, Inc.* v. *Trust Ins. Co.*, 430 Mass. 60, 63-64 (1999). *Hanover Ins. Co.* v. *Sutton, supra* at 177. *Clamp-All Corp.* v. *Foresta*, 53 Mass. App. Ct. 795, 813 (2002).

In this instance, the same specific allegation of misconduct generated all six counts or claims by the plaintiffs: that the Mical parties were listing and advertising their roofing and siding business in the greater Lawrence telephone directories under David's trade name. The six counts were simply alternate legal characterizations of the same underlying conduct.[15] As a practi-

---

volume of time can take into account the appropriate common-law fee criteria incorporated for c. 93A purposes by *Linthicum* v. *Archambault*, 379 Mass. 381, 388-389 (1979). See *Killeen* v. *Westban Hotel Venture, LP*, 69 Mass. App. Ct. 784, 791 (2007) (measurement of the reasonableness of the claimed amounts of time). The same information will furnish a record for informed appellate review of disputed amounts of awards.

[15]Count one constituted the c. 93A claim; count two alleged unfair competition; count three trade name infringement and disparagement and defamation; count four tortious interference with prospective business relationships (new customers); count five charged "identity theft"; and count six asserted entitlement to injunctive relief. In effect the c. 93A success accomplished the common goals of virtually all the counts and embodied the same preparation and evidence applicable to all theories.

Final disposition took the form of three judgments. First, a judgment on the findings of the court, from which the Mical parties appealed, consisted of liability, damages, and permanent injunctive relief in favor of the plaintiffs on counts one, two, and six, and the trade name infringement portion of count

cal matter, the preparation of the c. 93A claim was indistinguish-
able from the work upon the other theories of recovery.

*Conclusion.* For these reasons the plaintiffs were entitled to
injunctive relief and the awarded amounts of compensatory
damages and attorney's fees.

*Judgment affirmed.*

three; the same judgment included dismissal of count one of the Mical parties'
counterclaim, for unfair competition. Second, a separate judgment consisted of
dismissal of count two of the Mical parties' counterclaim, for abuse of process.
Lastly, a third judgment consisted of dismissal of counts four and five of the
plaintiffs' complaint, as well as so much of count three as alleged defamation.
No party appealed from the latter two judgments.