NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

14-P-1662                                        Appeals Court


NATIONAL GRID HOLDINGS, INC., & others[1]  vs.  COMMISSIONER OF
REVENUE.


No. 14-P-1662.

Suffolk.      December 11, 2015. - June 8, 2016.

Present:  Cypher, Carhart, & Blake, JJ.


Taxation, Abatement, Corporate excise, Accounting principle.
     Public Utilities.  Debt.  Corporation, Stock.  Evidence,
     Settlement offer.



     Appeal from a decision of the Appellate Tax Board.


     John S. Brown (Donald-Bruce Abrams with him) for the
taxpayers.
     Brett M. Goldberg for Commissioner of Revenue.


     CYPHER, J.  The plaintiffs, National Grid Holdings, Inc.

(NGHI), National Grid USA (NGUSA), and National Grid USA Service

Company, Inc. (NG Service) (collectively, taxpayers), appeal

from a decision of the Appellate Tax Board (board) in favor of

---

[1] National Grid USA and National Grid USA Service Company,
Inc.

the defendant, Commissioner of Revenue (commissioner), on the taxpayers' claims for an abatement of corporate excise for the tax year ended March 31, 2002. Primarily at issue is whether certain financing transactions, referred to as deferred subscription arrangements (DSAs), among various subsidiaries of National Grid plc (NGPLC), constituted true indebtedness so that the interest paid thereon qualified for the deduction allowed under the Massachusetts taxation of corporations statute, G. L. c. 63, § 30(4).

NGPLC is a British electric and gas utility company that owns numerous entities in the United States (U.S.), the United Kingdom (U.K.), and beyond (collectively, National Grid). The DSAs were financing arrangements designed by National Grid to take advantage of the differences in the U.S. and U.K. tax codes.[2] National Grid attempted to cast the transactions as indebtedness under U.S. State and Federal tax laws, thereby reducing National Grid's tax liability in the U.S., and as equity, under U.K. law, thereby reducing its taxable income in the U.K. Of overriding concern was the avoidance of any appearance of indebtedness in the U.K., where a debenture between a U.K. entity and its foreign subsidiary is strictly

_____

[2] The strategy, referred to as international tax arbitrage, is a tax planning technique in which a multinational corporation seeks to take advantage of differences in the tax laws of two countries to gain a tax advantage.

prohibited by statute, under threat of criminal sanctions.[3]  To that end, National Grid drafted the DSAs as agreements among various related entities to sell and repurchase shares of stock, maintaining in these proceedings that the mandatory nature of the stock repurchase constituted debt under Massachusetts corporate tax law.

"We will not modify or reverse a decision of the board if the decision is based on both substantial evidence and the correct application of the law."  Boston Professional Hockey Assn. v. Commissioner of Rev., 443 Mass. 276, 285 (2005).  We find no error with the board's determination that the taxpayers failed to satisfy their burden of proving that the critical provisions of the DSAs, upon which they rely, gave rise to an unqualified obligation to repay.  Accordingly, their claimed deductions for interest payments under the DSAs were properly rejected, as was their claim that the DSAs constituted a liability in calculating net worth.

Background.  We summarize the factual and procedural background from the board's very thorough account, provided in its June 4, 2014, findings of fact and report, which we supplement from the record where appropriate.

---

[3] Under that statute, a debenture is defined as any document that created, acknowledged, or evidenced a debt, as determined with reference to English common law.

National Grid entered the U.S. utility market in 1998, when it acquired New England Electrical System (NEES) and, shortly thereafter, Eastern Utilities Association (EUA). Pursuant to the acquisition, National Grid General Partnership (NGGP) became the parent of the U.S. group and NEES merged with NGUSA. In order to achieve tax efficiency in the purchase, National Grid created a domestic reverse hybrid, a tax structure whereby the U.S. entity was taxable as a corporation in the U.S. but was transparent, for tax purposes, in a foreign country.[4] The domestic reverse hybrid was part of a thirty-three-step process known as Project Mayflower, by which National Grid acquired NEES and EAU. National Grid used existing affiliates, and also created several U.K. and U.S. entities in the process that issued various intercompany loans to finance the acquisition of NEES and EUA and permitted National Grid to claim interest deductions in the U.S.

In February, 2001, the U.S. Treasury proposed regulations to restrict the use of domestic reverse hybrids. Under the new regulations, the interest payments made by the National Grid subsidiary would be treated as payment of dividends and subject to U.S. tax withholding. In the face of the proposed changes,

---

[4] NGGP did so by electing to be treated as a corporation in the U.S., able to deduct interest it paid on loans on its U.S. tax returns, without a corresponding recognition of income in the U.K.

National Grid sought to replace the domestic reverse hybrid with a different structure that would maintain its tax advantages, that is, the deductibility of interest payments in the U.S., and avoidance of income recognition in the U.K. Also to be avoided was running afoul of §§ 765-766 of the United Kingdom Income and Corporation Taxes Act 1988 (§ 765), which prohibits debentures between U.K. entities and foreign subsidiaries, and which carries criminal penalties.

The result was known as Project Spam and Project Spa. Project Spam was a forty-seven-step series of transactions that refinanced the $2.68 billion indebtedness incurred in the NEES acquisition. Project Spa was a forty-four-step series of transactions created soon after the Project Spam financing to finance National Grid's acquisition of Niagara Mohawk Holdings, Inc. (Niagara Mohawk), a New York utility company. The projects utilized the DSAs, which were structured as stock purchases, to retain the interest deductions and other tax benefits of the domestic reverse hybrid while avoiding creation of a debenture, as prohibited under U.K law. The relevant documents and provisions of the two projects being similar, we principally focus on Project Spam.

National Grid Eight Limited (NG8), was a U.K. entity created as part of Project Spam. The NG8 DSA was designed to reflect NGHI's $2.68 billion of outstanding debt for U.S tax

purposes.  We are directed to three documents critical to the dispute:  the articles of association of NG8 (articles); a December 20, 2001, offer for subscription of ordinary share capital; and an agreement for the sale and purchase of shares in NG8 (S&P agreement).  The offer letter extended to NGHI the opportunity to subscribe for 10 million shares of NG8, for $2.695 billion, with an initial payment of $15 million and three additional payments, referred to as call payments, on or after the dates and in the amounts specified in the NG8 article.  NG8 could make those calls only in the amounts and on dates specified in the documents.  The offer letter required that any acceptance be oral, thereby avoiding a document that might be construed as a debenture under § 765.

Upon NGHI's oral acceptance of the offer, NGHI paid $15 million to NG8 for 10 million NG8 shares, and then sold the shares for $2.695 billion to National Grid (US) Investments 4 (NGUSI4).  NGHI used the proceeds, totaling $2.68 billion ($2.695 billion minus the $15 million it paid to NG8), to repay the loans for Project Mayflower, now refinanced.

As noted, the articles provided that NG8 could make calls on NGHI for four call payments on or after specified dates.  The first three payments represented interest, and the final payment was principal and interest.  The S&P agreement provided that NGHI remain liable for the call payments, and that if NG8 failed

to make a call according to the schedule in the articles, NGHI was entitled to procure, through NGUSI4, that NG8 make the call (thereby avoiding interest at a higher rate). However, NGHI was under no obligation to exercise that right.

At the heart of this dispute is the nature of NGHI's obligation to repurchase the NG8 shares, and whether that obligation constituted the repayment of a debt, as determined by whether NGHI4's service of the notice to repurchase was discretionary or mandatory. Clause 2.9 of the S&P agreement provided that if NGHI failed to make a call payment within seven days of the call, or if NG8 made no call and NGHI failed to exercise its right to procure a call, NGUSI4 was "entitled to serve a notice" on NGHI requiring NGHI to repurchase the [NG8] shares. The parties agree that, under clause 2.9, NGUSI4's right to serve notice requiring NGHI to repurchase the shares was discretionary, as per the "shall be entitled to serve" language. Hence, clause 2.9 did not impose an unqualified obligation on NGHI to repurchase the shares.

The parties' disagreement centers on clause 2.10 of the S&P agreement. We set forth clause 2.10 in its entirety:

> "If for any reason whatsoever any sums due in respect of the [s]hares under [a]rticle 3 of the [a]rticles remain unpaid after 19 December[,] 2004, the [b]uyer shall serve a notice on the [s]eller requiring the [s]eller to repurchase the [s]hares on 20 December[,] 2004[,] or if this is not a [b]usiness [d]ay, the next [b]usiness [d]ay thereafter for a consideration equal to the net asset value of the

[c]ompany (as determined in accordance with clauses 2.11 to 2.14) and the aggregate of any sums remaining unpaid in respect of the [s]hares less the amount of any called up share capital not paid, and such consideration shall be paid in cash against delivery of a duly executed transfer on behalf of the [b]uyer in favour of the [s]eller and the delivery of the relevant share certificate.  If the [b]uyer exercises its rights under this clause and the [s]eller fails to complete the repurchase of the [s]hares at the time specified by the [b]uyer[,] the consideration due shall bear interest for the period from and including the date on which the failure to complete the repurchase has occurred up to the date of the actual payment (after as well as before judgment) at the rate which is the aggregate of [four] percent per annum above the base rate from time to time of Barclays Bank plc.  The interest will accrue from day to day and shall be payable on demand and shall be compounded monthly in arrears provided that no interest shall accrue under this clause 2.10 where interest is accruing under [a]rticle 3 of the [a]rticles."

The parties debate the interpretation of clause 2.10, and whether it required NGHI4, as the buyer, to serve notice to repurchase, or whether NGHI4 merely had the right to serve notice to repurchase.  According to National Grid, clause 2.10 establishes that NGHI4 was required to serve notice to repurchase and, as such, imposed on NGHI an unqualified obligation to repurchase the shares -- and hence, repay a debt.[5]

A month after Project Spam's implementation, Project Spa was carried out, consisting of forty-four steps, through which National Grid acquired Niagara Mohawk.  The DSA components of

---

[5] In reality, all of the calls and call payments were made prior to the applicable call default dates, and thus no notice to repurchase the shares was actually issued.  Interest paid on the call payments was disbursed to National Grid entities outside of the U.S.

Project Spa were similar to those for Project Spam, except for the companies involved, the dates, the number of shares, and the dollar amounts. Significant here, NGUSA filed a separate corporate excise return claiming a deduction in computing its taxable net worth for a liability for costs associated with the Niagara Mohawk acquisition.

NG Service was the principal reporting corporation for NGHI and NGUSA for Massachusetts tax purposes. For the tax year ending March 31, 2002, the taxpayers deducted the interest payments made under the DSAs, treating the DSAs as indebtedness. Similarly, NGHI treated the DSAs as deductible for purposes of calculating taxable net worth. The commissioner made additional assessments of corporate excise for the year ending March 31, 2002. The taxpayers filed applications for abatement, which the commissioner denied.

The taxpayers appealed the denial to the board, which held fifteen days of hearings and issued its findings of fact and report dated June 4, 2014. The board ruled that clause 2.10 did not mandate that NGHI4 serve notice to repurchase the NG8 shares, and was at best ambiguous as to whether NGHI4 was obligated to serve notice to repurchase or whether it merely possessed the right to serve such notice. The board concluded that the DSAs did not constitute true indebtedness and that the taxpayers were not entitled to the claimed interest deductions,

nor were they entitled to deduct the DSAs as a liability in computing taxable net worth. The board also denied the deductions for certain costs claimed in connection with the acquisition of Niagara Mohawk. The taxpayers filed this appeal.[6]

Discussion. 1. Standard of review. The standard of review is the parties' first point of contention. It is well established that "[a] decision of the board will not be reversed or modified if it is based on substantial evidence and on a correct application of the law." Koch v. Commissioner of Rev., 416 Mass. 540, 555 (1993). National Grid maintains that the board's interpretation of the DSAs is a question of law subject to de novo review. It is true that contract interpretation is ordinarily a question of law. See Robert Indus., Inc. v. Spence, 362 Mass. 751, 755 (1973). But it has also been observed that the question whether the taxpayers intended that a contractual arrangement obligate them to repay a debt is an issue of fact, see New York Times Sales, Inc. v. Commissioner of Rev., 40 Mass. App. Ct. 749, 752 (1996), and that the board's findings of fact are final. See Kennametal, Inc. v. Commissioner of Rev., 426 Mass. 39, 43 (1997). We may look at

---

[6] The taxpayers also filed a related appeal, National Grid USA Serv. Co. v. Commissioner of Rev., 89 Mass. App. Ct.      (2016), which concerns the effect of a closing agreement entered into between the taxpayers and the Internal Revenue Service.

whether the evidence is sufficient to support the board's conclusions of law, but our review in that regard "is limited to 'whether a contrary conclusion is not merely a possible but a necessary inference from the findings.'" Ibid., quoting from Commissioner of Rev. v. Houghton Mifflin Co., 423 Mass. 42, 43 (1996).

We therefore consider whether the board applied the correct legal standard in interpreting the relevant documents and whether its conclusion that the DSAs did not constitute indebtedness was supported by substantial evidence.

2. Unqualified obligation to repay. The board applied the correct legal standard in defining debt as "an unqualified obligation to pay a sum certain at a reasonably close fixed maturity date along with a fixed percentage in interest payable regardless of the debtor's income or lack thereof." Overnite Transp. Co. v. Commissioner of Rev. 54 Mass. App. Ct. 180, 186 (2002), quoting from Gilbert v. Commissioner of Int. Rev. 248 F.2d 399, 402 (2d Cir. 1957). In considering whether the DSAs qualified as debt, the board appropriately looked to the language of the DSAs as well as the circumstances of their creation and performance. See New York Times Sales, Inc., supra at 752-753; Overnite Transp. Co., supra. See also Shea v. Bay State Gas. Co., 383 Mass. 218, 222-223 (1981), quoting from United States v. Seckinger, 397 U.S. 203, 213 n.17 (1970)

("[c]ontract interpretation is largely an individualized process, with the conclusion in a particular case turning on the particular language used against the background of other indicia of the parties' intention").[7]

We begin with the text. As noted, the central issue is whether the service of the repurchase notice under clause 2.10 was mandatory or merely a right and, therefore, whether NGHI's obligation to repurchase shares under the DSA, and thereby repay the funds, was an unqualified one. The board ruled that the DSAs did not mandate service of notice to repurchase the shares and so did not reflect an unqualified obligation to repay on the part of NGHI.

National Grid maintains that the board misconstrued clause 2.10 as not imposing a mandatory requirement that NGHI4 serve a repurchase notice if the DSAs were not repaid by the final call default dates. National Grid points to use of the word "shall" in the first sentence of clause 2.10 in regard to serving the repurchase notice as plainly setting forth a requirement that NGHI4 serve the notice to repurchase if amounts remained outstanding as of the date specified, and triggering NGHI's

_____

[7] The board also referenced the list of factors set out in Fin Hay Realty Co. v. United States, 398 F.2d 694, 696 (3d Cir. 1968), but noted that, under that analysis, certain facts supported the taxpayers' argument while others cut against it. The board instead rested its decision on the lack of an unqualified obligation to repay, to be discussed, infra.

obligation to repay upon receipt of that notice.  The board pointed to the second sentence of clause 2.10, which speaks in terms of exercising a right, suggesting that NGHI4 was not required to serve notice, but instead had the right to serve notice, at its discretion.  The board concluded that, at best, clause 2.10 was ambiguous on the issue and rejected National Grid's argument largely on that basis.

National Grid challenges the board's ruling that the meaning of clause 2.10 was ambiguous as to the mandatory character of the notice.  A contract is ambiguous "where the phraseology can support reasonable difference of opinion as to the meaning of the words employed and the obligations undertaken."  President & Fellows of Harvard College v. PECO Energy Co., 57 Mass. App. Ct. 888, 896 (2003), quoting from Suffolk Constr. Co. v. Lanco Scaffolding Co., 47 Mass. App. Ct. 726, 729 (1999).  Contrary to National Grid's assertion, the board did not rest its conclusion of an ambiguity solely on the use of the word "shall" in clause 2.10 and whether it referred to the mandatory nature of the notice or to the date on which notice, if given, had to be served.  The board specifically pointed to the second sentence of 2.10, and the discretionary nature of a right to give notice.

The board's ruling, that clause 2.10 is ambiguous, is a correct application of law and is supported by substantial

evidence.  We therefore concur with the board's finding.  See
Browning-Ferris Indus., Inc. v. Casella Waste Mgmt. of Mass.,
Inc., 79 Mass. App. Ct. 300, 307 (2009).  The curious
inconsistency between the language employed in the first
sentence -- indicating "the [b]uyer shall serve" -- and the
second sentence -- which speaks of a right in the phrase "if the
[b]uyer exercises its rights," undercuts the taxpayers'
interpretation of 2.10 as setting forth a mandatory obligation.
The plain and ordinary meaning of a right, particularly in the
context of "if" a right is exercised, in no way connotes a
requirement or obligation to do anything.[8]  See Bailey v. Astra
Tech, Inc., 84 Mass. App. Ct. 590, 594 (2013) (words of contract
are interpreted according to their "plain meaning").  The
incongruity between the first sentence and the second sentence
in clause 2.10 renders the clause ambiguous on its face, because
under the second sentence, the obligation to repurchase the
shares was not an unqualified one; it depended on whether the
right to serve the final repurchase notice was exercised.  See,
e.g., Post v. Belmont Country Club, Inc., 60 Mass. App. Ct. 645,
652 (2004), quoting from Fashion House, Inc. v. K Mart Corp.,

---

[8] Various definitions of a "right" include "something to
which one has a just claim," such as "a power or privilege
vested in a person by the law," or "a legally enforceable claim
against another," or "a capacity or privilege the enjoyment of
which is secured to a person by law."  Webster's Third New
International Dictionary (1993).

892 F.2d 1076, 1083 (1st Cir. 1989) ("Contract language is ambiguous where 'an agreement's terms are inconsistent on their face or where the phraseology can support reasonable difference of opinion as to the meaning of the words employed and obligations undertaken'").

National Grid argues that, upon concluding that clause 2.10 was at best ambiguous, the board should have resolved the ambiguity by reference to extrinsic evidence, in particular the "preliminary negotiations, the conduct of the parties, and interviews between them after the contract is executed," citing Rizzo v. Cunningham, 303 Mass. 16, 21 (1939). In resolving an ambiguity, however, the board was entitled to evaluate the parties' circumstances as well as intentions at the time of formation. See Castricone v. Mical, 74 Mass. App. Ct. 591, 599 (2009). In essence, National Grid is arguing that the board should have given more weight to evidence that favored National Grid's interpretation, in particular the testimony of a National Grid employee and a memorandum from its tax advisers, that clause 2.10 was drafted to require mandatory service of the repurchase notice.

Contrary to National Grid's assertion, the board did not apply an improper legal standard in according little weight to evidence of the subjective intent of National Grid employees and tax advisors. First, the weight of the evidence, the inferences

to be drawn therefrom, and the credibility of the witnesses are all matters for the board.  See Kennametal, Inc., 426 Mass. at 43 n.6.  And particularly in this instance, where related entities were on both sides of the transactions, the board was not required to credit evidence of the taxpayers' subjective intent.  "[M]ere declarations by the parties that they intend a certain transaction to constitute a loan is insufficient if it fails to meet more reliable indicia of debt which indicate the 'intrinsic economic nature of the transaction.'"  Alterman Foods, Inc. v. United States, 505 F.2d 873, 877 (5th Cir. 1974), quoting from Fin Hay Realty Co. v. United States, 398 F.2d 694, 697 (3d Cir. 1968).  In cases like this, "courts look with great care to the surrounding facts and view with some suspicion declarations of intent which have the effect of maximizing the tax benefit."  Ibid.  Where the entities involved are under common control, the fact that "all the formal indicia of an obligation were meticulously made to appear," may be entitled to less weight, as the drafters "had the power to create whatever appearance would be of tax benefit to them despite the economic reality of the transaction."  Fin Hay Realty Co., supra.

By the same token, the board was entitled to reject National Grid's explanation of its use of the phrase "if the [b]uyer exercises its rights."  National Grid's expert, Graham Aaronson, who was qualified as an expert in English commercial

law and U.K. tax law, explained the second sentence of clause 2.10, "if the [b]uyer exercises its rights," as simply meaning "if this clause applies."  But if that is all that was meant, the drafters could have said so, in far simpler language.  See, e.g., Jefferson Ins. Co. of N.Y. v. Holyoke, 23 Mass. App. Ct. 472, 476 (1987) (contract's plain language will not be distorted where parties could have used appropriate language to indicate different intent).[9]  The board could consider that these were sophisticated taxpayers whose tax advisors carefully drafted the transactions so as to yield the most beneficial tax consequences.  See, e.g., Estate of Leavitt v. Commissioner of Internal Rev., 875 F.2d 420, 424 (4th Cir. 1989) ("It must be borne in mind that we do not merely encounter naive taxpayers caught in a complex trap for the unwary").  Giving the phrase "if the [b]uyer exercises its rights" its plain and ordinary meaning, the phrase does not harmonize with the "shall serve" language of the first sentence of clause 2.10 if the service of notice was intended to be mandatory.

Rather than relying on the taxpayers' declarations of intent, the board appropriately looked to "the more reliable criteria of the circumstances surrounding the transaction." Alterman Foods, Inc., supra.  Principal among these, according

_____

[9] National Grid's attempt to ignore the clause's second sentence, and relegate it to a footnote in its brief, does not strengthen its cause.

to testimony of the experts for both sides, was the legal context in which the DSAs arose. The record establishes that the DSAs were designed to take advantage of the deduction allowed for interest on indebtedness under U.S. tax laws, while avoiding taxable income on the interest payments to the U.K. recipient.

Even more significant, according to the testimony of the parties' respective U.K tax law experts, Malcolm Gammie and Graham Aaronson, the overriding concern in drafting the DSAs was to avoid the appearance of debt under U.K. law. Both experts testified that avoidance of any writing evincing debt was paramount for purposes of § 765, because the statute imposes criminal sanctions on the directors of a U.K. corporation for a debenture issued by a nonresident subsidiary. The primacy of the taxpayers' concern to avoid a document evincing a debt was repeatedly emphasized by the expert witnesses.

In particular, Aaronson testified that, for that reason, "a rather cumbersome process" was utilized to make it impossible for the U.K. tax authority to argue there was a debenture. The transactions were deliberately designed with indeterminate dates and methods of payment, and with amounts due only upon notice given, and in the form of an asset repurchase rather than repayment. According to Aaronson, it would be impossible for the U.K. authorities to view this contingency as a debt.

Aaronson further testified that § 765 carried sanctions and was taken very seriously, that taxpayers in general, and National Grid in particular, were highly concerned about the possibility of issuing a debenture subject to § 765, and that a taxpayer would go to great lengths to avoid it.

The board specifically referenced Aaronson's testimony in describing avoidance of § 765 as "the essence of the tax planning" in these projects, and that "cumbersome mechanisms" were put in place so that the U.K. tax authority "would not be able to identify any document or combination of documents as giving rise to indebtedness created or evidenced" by the documents.

Malcolm Gammie, the commissioner's expert on U.K. law, similarly testified that the taxpayer would want absolute assurance that the transaction would not breach § 765. Gammie also testified that it was the essence of the transaction to avoid problems with § 765, noting, for example, that the subscription letter required oral acceptance.

In the end, the board rejected National Grid's argument that the repurchase notice under clause 2.10 should be interpreted as mandatory. The board specifically found that "clause 2.10 could not be construed as compelling service of a notice to repurchase or, in turn, payments by NGHI." To the extent the board ruled the clause ambiguous, the board was

entitled to rule against the taxpayers, based on its findings concerning the circumstances surrounding the DSAs, the taxpayers' intentions in the context of an international tax arbitrage, and the board's assessment of the witnesses' credibility. See Castricone, 74 Mass. App. Ct. at 600, quoting from Edinburg v. Edinburg, 22 Mass. App. Ct. 199, 203 (1986) ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous").

We observe, as well, that it was the taxpayers who had the burden of proof on every material fact regarding their right to an abatement. See IDC Research, Inc. v. Commissioner of Rev., 78 Mass. App. Ct. 352, 358 (2010). It was therefore the taxpayers' burden to prove that the DSAs constituted an unqualified obligation to repay, and the board properly could find that the taxpayers' burden was not met with documents, drafted by them, that were ambiguous on that very point. See Estate of Leavitt, 875 F.2d at 424 (taxpayer's burden to prove debt is especially difficult to meet where "transaction is cast in sufficiently ambiguous terms to permit argument either way depending on which is subsequently advantageous from tax point of view"). This is in keeping with the general rule that an ambiguous contract is construed against its author, which "rests upon the practical and fair premise that the drafter had the capacity and opportunity for clear expression and that he should

bear the detriment of unclear expression." Air Plum Island, Inc. v. Society for the Preservation of New England Antiquities, 70 Mass. App. Ct. 246, 253 (2007).

We reject National Grid's alternative argument that, even if not mandatory, NGHI's right to serve a notice to repurchase the shares on a fixed date was sufficient, in itself, to establish an unconditional obligation to repay. The Federal cases on which National Grid relies do not bear that out. See, e.g., Jewel Tea Co. v. United States, 90 F.2d 451, 453 (2d Cir. 1937) (while there cannot be debt in the absence of an unconditional right to demand payment at a fixed time, the presence of such a right does not, in all circumstances, mean shares are debts); Merck & Co. v. United States, 652 F.3d 475, 483 (3d Cir. 2011) (formal, explicit unconditional obligation to repay was not an absolute prerequisite where an interest rate "swap" was structured "to ensure repayment of funds as a practical matter"). National Grid fails to persuade us that the DSAs were structured so as to ensure that the shares were repurchased or that the mere right to give notice to repurchase rendered the obligation to repay an unqualified one.

3. DSAs as liabilities for computing taxable net worth. NGHI was subject to tax on its taxable net worth pursuant to c. 63, § 30(11). NGHI argues that it was entitled to treat the DSAs as debt and, accordingly, as liabilities deductible from

its total assets in computing its taxable net worth. The board deemed the argument moot, based on its ruling that the DSAs were not debt and, as such, could not be considered liabilities in determining net worth. See, e.g., Overnite Transp. Co., 54 Mass. App. Ct. at 180.

National Grid presses the significance of the fact that NGHI treated the DSAs as liabilities on NGHI's financial statements. Relying on Xtra, Inc., 380 Mass. 277, 280-281 (1980), National Grid maintains that the net worth assessment should be consistent with the manner in which the taxpayer actually accounted for the liability on its own books. The reference in that case, however, was to a generally accepted accounting principle, and not to an individual taxpayer's particular method of accounting for a given expense, however erroneous.

In Xtra, Inc., for example, the Court recognized the accounting practice of accelerating depreciation on personal property in computing income tax liability, and affirmed the taxpayer's inclusion of its future obligation to pay the income tax it deferred, through accelerating the depreciation deductions, as a liability. The holding was a narrow one: "[A] corporation which takes accelerated depreciation may treat the income taxes deferred thereby as a liability." Id. at 278. We will not extend the outcome in that case to the present

situation to allow the taxpayer's characterization of the DSAs as a debt to dictate the central issue of their tax treatment for purposes of calculating taxable net worth.  And as the board recognized in Xtra, Inc., even "a generally accepted accounting principle, 'of itself and standing alone, cannot necessarily dictate the result in tax cases.'"  Id. at 281, quoting from First Fed. Sav. & Loan Assn. v. State Tax Commn., 372 Mass. 478, 483 (1977), aff'd, 437 U.S. 255 (1978).

Indeed, First Fed. Sav. & Loan Assn., is more to the point. In deciding whether dividend and interest payments made to members of a savings and loan association were deductible as operating expenses, the Supreme Judicial Court reasoned that there was no basis "for assuming that the Legislature intended to import accounting practice into its statutory language and thus to permit accounting principles to be the guide to the meaning of the words 'operating expenses.'"  Id. at 483. Determining that the taxpayer's members were more akin to investors than creditors, the court concluded that payments to them represented dividends rather than debt.  Id. at 484-485.

We agree with the board that the DSAs could not properly be treated as debt and, hence, as liabilities, and we see no reason to revisit the outcome implicit in Overnite Transp. Co., supra, that the determination of indebtedness for purposes of interest deductions resolved the issue for calculating net worth as well.

4.  The U.K. stamp duty.  NGUSA claimed a deduction in computing its taxable net worth for costs associated with the acquisition of Niagara Mohawk.  The board rejected certain of those expenses for lack of proof that they were incurred in connection with the acquisition.  The board further reasoned that the taxpayers did not show that NGUSA itself paid the costs, that according to the evidence, some were paid by U.K. entities while others were paid by NEES.

On appeal, National Grid claims that it offered sufficient proof that NGUSA paid a $26.5 million liability for U.K. stamp tax duty in connection with the Niagara Mohawk acquisition, that the amount was recorded on NGUSA's books, and that it was properly allocated to NGUSA.  National Grid's witness, John Cochrane, who served as the chief financial officer for National Grid's U.S. businesses at the time of the acquisition, testified that the stamp tax was paid by NGPLC, and that NGUSA repaid NGPLC for that amount five years later.  While the testimony confirms that NGUSA paid the U.K. entity the stamp tax amount some five years after the transaction, it was unclear from the evidence why the expense was NGUSA's liability.

The board emphasized that it was the taxpayers' burden to demonstrate that the expenses claimed as liabilities in calculating NGUSA's net worth were properly allocated to NGUSA and were actually paid by NGUSA.  The board found that "neither

Mr. Cochrane's testimony nor the record as a whole provided sufficient credible evidence to establish either fact," and, based on our review of the record, and our deference to the board's role in weighing the evidence and assessing witness credibility, we find no error.

National Grid further argues that there was proof in the record that NEES had merged into NGUSA after being acquired by National Grid, so that NEES and NGUSA were the same legal entity and that expenses paid by NEES were liabilities of NGUSA for net worth purposes. According to the board, however, Cochrane did not explain why NEES was the source of the payments for which NGUSA claimed liability, and it was the taxpayer's burden to establish each fact necessary to its claim for an abatement. See, IDC Research, Inc., 78 Mass. App. Ct. at 358.

5. Closing agreement. National Grid sought to introduce a document entitled "Department of the Treasury Internal Revenue Service Closing Agreement on Final Determination Covering Specific Matters," (closing agreement), between the Internal Revenue Service (IRS) and NGHI that, according to National Grid, included a final determination of NGHI's interest deductions for the tax year at issue. The question whether the closing agreement between the taxpayers and the IRS was binding as to the interest deductions allowable under Massachusetts law is the subject of a separate appeal. Here, National Grid argues that,

even if not binding, the closing agreement still should have been admitted.  National Grid claims that the adjustments made by the IRS in interest deductions pursuant to the closing agreement are relevant to determining the taxpayers' Massachusetts tax liability.

We agree with the board's ruling that, for evidentiary purposes, the closing agreement constituted the settlement of a claim, and the board did not abuse its discretion in excluding it.  See Morea v. Cosco, Inc., 422 Mass. 601, 603-604 (1996) (no evidence of settlement is admissible to prove liability or the amount of a claim).  See generally Zucco v. Kane, 439 Mass. 503, 507 (2003) (absent abuse of discretion or other legal error, judge's ruling on evidence will not be disturbed).  Moreover, as the commissioner points out, in PMAG, Inc. v. Commissioner of Rev., 429 Mass. 35, 40-41 (1999), upon which National Grid relies, the admissibility of a closing agreement between the taxpayer and the IRS was not at issue.

National Grid also complains that the board allowed the commissioner's posttrial motion to treat the closing agreement as impounded material in the record appendix.  However, it appears that National Grid failed to object when making its offer of proof to the procedure utilized by the board in accepting the closing agreement for identification and including it with the record in a sealed envelope.  The hearing transcript

suggests, rather, that National Grid concurred at that point. National Grid does not indicate why inclusion of the closing agreement in the record appendix in the same manner constitutes error.

Conclusion.  Based on the foregoing, we conclude that the taxpayers failed to establish their right to abatements for the tax year in question.  The decision of the Appellate Tax Board is affirmed.

So ordered.